## THE MABEY AND COOPER.

1. Although the general rule is that a party who does not appeal cannot be heard in opposition to the decree, still where it appeared—the suit below being a libel for collision against a tug and her tow—that an appeal from the District Court to the Circuit Court had been taken from the entire decree by the owners of the tow who had ordered the tug, and who had undertaken her defence as well as their own, and thus represented the entire interest of the losing party in the suit, an appeal by the tug from the Circuit Court to this court was entertained here, though the court observes that doubt might perhaps exist as to the regularity of the proceeding

2. Where a ship ordered a tug to tow her out of the East River to sea in an unfavorable state of the wind and tide, and when the navigation was made in that state dangerous by ice, and the master of the tug remonstrated against setting off in the then condition of the wind and tide, and finally went only on the ship's owners insisting on her towing, and on their agreeing to take the risk of all accident, both ship and tug were held liable for a collision, there being in addition some evidence of faulty navigation.

3. An amended answer setting up an improbable defence, and one quite departing from that set up in the answer, treated unfavorably.

APPEAL from the Circuit Court for the Eastern District of New York; the case being thus:

The ship Helen Cooper, lying at her dock in the East River, at Brooklyn, near the gas-works there, on Saturday the 17th of February, 1866, with her stern towards the river but ready for sea, applied to the captain of the steamtug Mabey to tow her out. Immediately opposite, at pier 45, on the New York City side, was lying at the same time and well in her dock, another ship, the Isaac Chapman. The wind on that day was somewhat high, the East River on the Long Island side of it was filled more or less with ice, and the day generally was not favorable for a sailing vessel's getting out of that part of the East River for sea. The Isaac Chapman, at least, like the Helen Cooper, was on that day and at that hour ready for sea, but was afraid to go out, and remained waiting till the river by slack water should be made less dangerous from ice. Other sailing vessels, however, *in other parts of the East River and at a different hour* sailed, on the 17th, and many from the North River. The captain of the Mabey when desired to tow out the Helen Cooper, remarked upon the state of the tide and unpropitious character of the day generally, and advised her owners to wait till the tide changed and the river got more free of ice. The owners seeing no danger, and wanting the Mabey to get off, resolved to go, and ordered the tug to proceed. "We will take," said their agent, "the risk of all accidents." Accordingly the Mabey attached her hawser and pulled the Helen Cooper out, stern foremost, into the middle of the stream; cutting the hawser there and attaching it in a new way.

From this point and before the operation of getting her under the intended way was completed, she shot straight into the Isaac Chapman, near the main rigging, cutting her down to the water's edge, carrying away her back-stays and mizzen-stay, mashing her boats, starting her deck, and disabling her generally.

The owners of the Chapman hereupon libelled both the tug and ship. The tug answered on the 7th of May, 1867, setting forth that her master informed the owners that it was not safe to proceed to sea in the then condition of the weather and tide. That the agent of the owners *insisted* that the vessel should go to sea; that he yielded to the orders of the agent of the ship, he agreeing that the owners would assume all risk; that the collision was occasioned by disobedience of the orders of the pilot and bad navigation of the ship; that the order of the pilot was not to cast off the hawser by which the ship was moored but only to slacken it until the head of the ship was swung round; that the order was disobeyed, and that the hawser was cast off before the ship came round, which sent the ship over to the New York shore; and that the ship, when she had reached the middle of the stream, *and was headed down stream*, put her helm hard aport, so that she took a sheer to starboard, which caused her to run into the Chapman.

As the master of the tug had acted in the whole matter against his own judgment, and had set out at all only upon the request of the owners of the ship Helen Cooper, and on their agreeing to take upon themselves all risks, *they* now largely took upon themselves the management of the defence. They had already, May 2d, 1867, put in an answer. By the answer they set up,

"That they had a Sandy Hook pilot on board; that by his direction the tug took the ship in tow by hawser; that at this time the ship was lying at the wharf with her bows up and her stern out; that the hawser was made fast to her bows on the port side of the ship, and passed along aft, and there made fast by stops, and that the ship was towed stern foremost into the stream; that, as she passed out into the stream, the stop at the

stern was cut, so as to allow her bow to turn around and head down the river; that while in the act of turning, both the ship and tug were unexpectedly caught in an immense field of float-ing ice, which, in spite of the tug, set both the ship and tug towards the New York shore; that, finding that the field of ice was too powerful for the tug to control, both anchors of the ship were let go, with a large amount of chain, notwithstanding which, the ice carried the ship and tug across and down the river, so that the head of the ship having finally got pointed down the river, was carried by the ice so that her bows were carried inside pier 45, and into the side of the Chapman; thus causing any damage that was done. That the field of ice in which the ship became entangled was too powerful to be con-trolled; and that all which she could do, was to drop her an-chors with a view to stop her headway; which, however, being done, failed to bring her up; that the collision was thus the re-sult of inevitable accident; or if not of inevitable accident, then certainly that it arose from no fault of the ship, or her officers, or crew."

An *amended* answer was as follows:

"That, at the time there was considerable floating ice on the Brooklyn side of the East River, but that the river was clear for a considerable distance out on the New York side; that, owing to the floating ice, the ship was turned with more diffi-culty than it would otherwise have been; that the tug had got the ship's head turned down the river, angling towards the New York shore, and with most of the ship in clear water, free from ice; that, while the tug was thus successfully towing the said ship, and angling well off her port bow so as to keep her head turning down the stream, until she should head directly down, *a ferry-boat suddenly and improperly crossed the bows of the tug,* and in order to prevent the striking the said ferry-boat the head-way of the tug was suddenly slowed, but that with the im-petus which the ship had, she shot ahead towards the piers on the New York side; that, the instant the pilot discovered that the tug had slowed he waved her on, but that she could not go on without running into the ferry-boat; that, instantly upon the slowing of the tug it was seen that the tug had lost, by slowing, the control of the ship; that both anchors were at once let go, they being all ready for that purpose, but that

owing to the character of the ground the ship overran her anchors, and dragged them both, and came upon the Chapman; that the wheel of the ship was hard astarboard from the time she left the pier at Brooklyn to the time of coming into contact with the injured vessel Chapman."

Though both the master of the Helen Cooper and the pilot swore positively to this ferry-boat's shooting out of her dock in the way described, and that this—by compelling the tug to slow, and so to slack her hawser, and let the ship drift without motive power on a wrong course—was the cause of the whole difficulty, yet some other testimony went to show that the collision was caused primarily by setting out in an unfavorable state of the tide, and when the ice rendered navigation difficult; in proceeding with too much rapidity, and in towing with too long a hawser; and from the causes set forth in the answers of the owners of the tug.

The District Court condemned both tug and ship; and the owners of the ship, who had undertaken and managed the whole defence, appealed to the Circuit Court, where the decree was affirmed. From the decree of affirmance the owners of both the tug and of the ship appealed to this court.

*Messrs. Beebe, Donohue, and Cooke, for the appellants:*

There is no sufficient positive testimony that the day was an unsafe one. It was a Saturday, when, of course, five ocean steamers set off. Some sailing vessels also set off. On the other hand, there is sufficient and most positive testimony that the tug was embarrassed by a ferry-boat suddenly shooting out of dock, passing ahead of her, and that by the tug stopping, the ship, which had considerable way on, and had not got headed around, was left without motive power to keep her in the right course; and so that she could not avoid the collision, although she made all the efforts in her power, by dropping her anchor, and otherwise.

The East River opposite New York is not so wide as that you can turn a large ship in the middle of the river, and if

you could not run near the opposite shore you could never turn.

The cause of the collision was an inevitable accident, and such a one as neither tug nor ship could guard against. It was no fault of either that the ferry-boat embarrassed the tug, and had there not been a cake of ice in the river, or had the hawser been the shortest, that embarrassment would have been equally as great. Indeed, if the hawser had been shorter the ship would have been into the tug and both into the ferry-boat; and perhaps all into the Chapman.

The ship was under the control and management of the tug, and she is not responsible for the acts or faults of the tug. It is no cause to hold her responsible that the owners of the ship assumed the defence of the tug, because if the collision happened by the ship's fault, the tug should be discharged. Yet she is held. It is not good sense to hold both the ship and the tug responsible. If the fault is on the one or the other the court must say so.

If both the tug and ship are in fault, the loss should be equally divided between them.

*Messrs. Benedict and Benedict, contra:*

As to the appeal taken by the tug. No appeal was taken in her behalf from the decree of the District Court. The ship having assumed her defence, she had no further care of the controversy and took no appeal. She is, therefore, in no situation to take an appeal from the decree of the Circuit Court, and her appeal ought to be dismissed.

As to the ship's appeal. The sole defence set up in the ship's answer was that the ship was " unexpectedly caught in an immense field of floating ice." The amended answer entirely abandons this defence, even contradicting it in material points, and sets up as a defence that " a ferry-boat suddenly and improperly crossed the bows of the tug," caused her to stop and *thus* caused the collision. This new defence was clearly an afterthought. The ship's codefendant, the tug, sets up no such defence. Yet the defence is one which must be applicable to both the tug and the ship, if it had

any existence at all. It is one whose existence must have been better known to the tug than to the ship, and the fact that the tug does not set it up but charges the collision to be the result of negligence on the part of the ship, throws the strongest suspicion upon it. This suspicion is still further strengthened by the subsequent conduct of the cause. The tug having made this charge upon the ship, the latter, by agreement, takes upon herself all the responsibility of the litigation, and then fails to put before the court any evidence from the tug as to the occurrence in question. The inference is irresistible that her owners knew that those witnesses would not sustain their theory of the defence, but would show negligence on the part of the ship, and that they took this course to keep this evidence from the knowledge of the court. This they have succeeded in doing, but they cannot avoid the conclusions to which such a course of conduct on their part necessarily exposes them.

It is vain to say that the matter of the ferry-boat was after discovered. It is not credible that the owner of the ship had never inquired the cause of the collision; nor is it credible that, having inquired, he should have heard nothing of this ferry-boat, or should have forgotten all about her, if she was the cause of it. And how is the fact to be accounted for, that, while the witnesses from the tug must have been, from their position, the best witnesses to prove the existence and movements of this ferry-boat, and that while the ship, by assuming the responsibility of the defence, had done all in her power to make those witnesses disinterested, she failed to call one of them to support her allegations? It is plain that this alleged ferry-boat, of whom no one can tell the name, whence she came, or whither she went, had no real relation to the disaster. Independently of all which the court is asked to hold that an ordinary movement of a Brooklyn ferry-boat is an inevitable accident, and that this ship is not liable for the consequences, resulting to an innocent third party from her failure to provide for and guard against such ordinary movement.

It is plain from the general aspect of the case that the ship

desired as soon as possible to get out of the ice into the clear water, which led them to go over to the New York side, and then the tug had not sufficient power in that narrow space to keep the ship off from the docks.

It was recklessness on the part of the ship to go to sea at all when she did. It does not in the least alleviate this to show that steamers sailed, as ocean steamships do, from the *North* River on the same day, or that other vessels left other —the lower—parts of the East River at slackwater; no doubt, before the ice began to run.

If the ship had to go to sea at the hour when she did, it was negligence not to have had a second tug. If the condition of things was such in the river that the ship was compelled to go in such dangerous proximity to the piers, and that the crossing of a ferry-boat, which is always to be expected in that part of the river, made the difference between safety and the injury which she actually wrought, that should have been foreseen and guarded against by having a tug alongside. A tug alongside would have averted the collision.

Both vessels must take the consequences of the negligence. The ship was the *dux facti*. It was her doing; but the tug, undertaking the service at the risk of the ship, is none the less to blame. She had no right, no matter what guarantees she had, to undertake this dangerous service, single-handed, in a port whose piers were lined with valuable ships and cargoes, fastened fore and aft, and helpless alike to resist or to escape.

The case falls within what is said in *The Bridgeport.*[*]

Mr. Justice CLIFFORD delivered the opinion of the court.

Controversies growing out of collisions between ships arise where the colliding vessel was in charge of a tug in which both the tug and the tow are liable for the consequences, as when the officers and crews of both vessels jointly participated in their control and management and where those in charge of both vessels are deficient in skill,

---

[*] *Supra,* 116.

omit to take due care, or are guilty of negligence in their navigation. Cases also arise where the tow alone is responsible, as where the tug is employed as the mere motive power to propel the tow from one point to another, and both vessels are under the exclusive control and management of the officers and crew of the tow. Other cases also arise where the tug is solely responsible, as where the tug, under the charge of her own master and crew, undertakes to transport another vessel from one point to another, which, for the time being, has neither her master nor crew on board, as in that case her officers and crew direct and control the navigation of both vessels.*

Compensation is claimed in this case by the owners of the ship Isaac Chapman for injuries which the ship received in a collision between the ship of the libellants and the ship Helen Cooper and the steamtug R. L. Mabey, which had the latter ship in tow. As alleged in the libel, the collision occurred on the seventeenth of February, 1866, in the harbor of New York, while the ship of the libellants was moored on the upper side of pier forty-five in East River, and the proofs show that she lay with her head towards the shore, her stern being twenty feet inside of the outer end of the pier. She had a cargo of merchandise on board and was ready for sea, but those in charge of her did not deem it prudent to leave the wharf at that time as the tide was ebb with a strong current and there were large masses of floating ice in the stream.

Different views, however, were entertained by those in charge of the ship Helen Cooper, which was also loaded and ready to sail for a Southern port. By the answer as originally filed it appears that she was lying at the wharf of the gas-works, on the Brooklyn side of the river, with her head towards the shore and her stern towards the stream; that while in that situation those in charge of the steamtug R. L. Mabey made fast to her bows on the port side by a hawser

---

* Sturgis v. Boyer et al., 24 Howard, 122.

which was passed aft and there fastened by stops, and by that means she was towed into the stream stern foremost, the tide having just commenced to ebb, and the statement of the answer is that as the ship passed out into the stream the stop at the stern was cut so as to allow the ship to turn and head down the river, and that both the ship and the steamtug, while the ship was in the act of turning, were unexpectedly caught in an immense field of floating ice, which, in spite of the power of the steamtug, set both vessels towards the opposite shore and carried them down and across the river so that the bows of the ship passed inside of pier forty-five and struck the side of the ship of the libellants and caused whatever damage the libellants' ship received by the collision. Proof of the collision, therefore, is unnecessary, as the allegation is admitted, but the respondents allege that the ship is not liable, as the collision was the result of inevitable accident.

Prompt appearance was also entered by the claimant of the steamtug, and he filed a separate answer, in which he alleges that the master of the steamtug when applied to on that day to tow the ship of the respondents to sea informed the owners that it was not safe to proceed to sea in the then condition of the weather and tide. Had he himself been governed by that opinion the case of the steamtug would be quite different, but the proofs show that he yielded to the importunity of the owners or agent of the ship and took her in tow, the owners of the ship agreeing to assume the risk of all accidents and dangers. Apart from that he also charges that the collision was occasioned by disobedience of the orders of the pilot and faulty navigation of the ship; that the order of the pilot was not to cast off the hawser by which the ship was moored but only to slacken it until the head of the ship was swung round; that the order was disobeyed, and that the hawser was cast off before the ship came round, which had the effect to set the ship over to the opposite shore towards the ship of the libellants; and he also charges that those in command of the respondents' ship, when she had reached the middle of the stream "and

was headed down stream," put her helm hard aport so that the ship took a sudden sheer to starboard, which caused her to run into the ship of the libellants.

Leave was granted to the owners of the respondent ship to file an amended answer, in which they still insist that the collision was the result of inevitable accident, but of a widely different character from that described in the original answer filed more than five months earlier. They now allege that the river was clear of ice for a considerable distance on the opposite side of the river; that owing to the ice on the side where the ship lay it was more difficult than it otherwise would have been to turn the ship so that she would head down the river, and that while the steamtug was endeavoring to accomplish that object a ferry-boat suddenly and improperly crossed the bows of the steamtug; and in order to prevent striking the ferry-boat it became necessary that the steamtug should be suddenly slowed, which had the effect to turn the ship towards the opposite shore and caused the collision, in the manner more fully described in the amended answer.

Both parties took testimony and were fully heard in the District Court, and the District Court being of the opinion that both the tug and the tow were in fault, entered a decree for the libellants against both the respondent vessels, and the owners of the ship appealed from the whole decree to the Circuit Court, where the parties were again heard upon the same pleadings and proofs, and the Circuit Court affirmed the decree of the District Court, holding that both the respondent vessels were in fault. Whereupon the owners of the respective vessels took separate appeals to this court.

Objection is made that the owners of the steamtug could not properly appeal to this court, as they did not formally appeal from the District Court to the Circuit Court, but it is not necessary to decide that question, as it is quite clear that the decree must be affirmed against the tug as well as the tow. Nor is the court prepared to admit the validity of the objection, as the record shows that the owners of the tow

signed a written stipulation before the decretal order was entered in the District Court, that they, as the owners of the ship, would assume the entire conduct of the defence and that they would answer and pay whatever sum the libellants should recover in the case against both vessels. Undoubtedly the general rule is that a party who does not appeal cannot be heard in opposition to the decree. Still it appears in this case that an appeal from the District Court to the Circuit Court was taken from the entire decree, and by a party who represented the entire interest of the losing party in the suit. Well-founded doubt may, perhaps, arise as to the regularity of the proceeding, but it is not necessary to solve that doubt in the present case.

Suppose the appeal is correctly here, we are all of the opinion that the decree of the court below was correct.

Where the collision occurs exclusively from natural causes, and without any negligence or fault on the part of either party, the rule is that the loss must rest where it fell, as no one is responsible for an accident which was produced by causes over which human agency could exercise no control. Such a doctrine, however, can have no application to a case where negligence or fault is shown to have been committed on either side. Inevitable accident, as applied to a case of this description, must be understood to mean a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident, and where the proofs show that it occurred in spite of everything that nautical skill, care, and precaution could do to keep the vessels from coming together.*

Want of due care is shown in the fact that the ship went to sea at a moment when the master of the tug which had her in tow knew that it was not safe in view of the condition of the weather and tide; nor can the tug be held blameless any more than the ship, because as the master ultimately

---

* The Pennsylvania, 24 Howard, 313; The Morning Light, 2 Wallace, 556.

yielded to the importunities of the owners of the ship and assumed the risk, subject to his claim on the owner of the ship for indemnity. Faulty navigation is also shown, which of itself is a sufficient answer to the defence of inevitable accident.

Palpable error is shown to have been set up in the original answer filed by the owners of the ship, and the court is not satisfied that the defence set up in the amended answer is entitled to any more credit. Such a defence as that set up, that a ferry-boat suddenly and improperly crossed the bows of the steamtug, if founded in fact, could easily be proved by those who were on board the ferry-boat and know what occurred. Instead of that, not even the name of the ferry-boat is given, either in the answer or in the proofs, and not a witness is called except the pilot and the master of the ship, and their statements in that behalf are not satisfactory. No such defence is set up in behalf of the steamtug, and nothing of the kind was alleged in the original answer filed by the owners of the ship shortly after the suit was commenced. Neither of the courts below appear to have given that defence much credence, and this court concurs with the subordinate courts that the defence is not established.

DECREES AFFIRMED.