COXE BROS. & CO., Inc., v. CUNARD S. S. CO., Limited, et al. BERWIND–WHITE COAL MINING CO. v. SAME. M. P. SMITH & SONS CO. v. SAME.

(District Court, S. D. New York. November 24, 1909.)

MUNICIPAL CORPORATIONS (§ 849*)—WHARVES—LIABILITIES FOR INJURIES—SHIPPING.

Damage to vessels lying between the piers above No. 54, North River. The damage occurred by the breaking of mooring posts on pier 54, when used by the steamship Mauretania in a strong southeast wind and the swinging of the forward part of the steamer to the northward. The pier belonged to the city of New York and the posts were erected thereon by it, but as they were of the usual size and strength. it was *held* that the accident was not due to their insufficiency and that the city was not liable; also *held* that the accident was not inevitable, but resulted from the use of the pier by the Cunard Company without affording adequate protection to this unusually large steamer by shed or structures on the pier.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. § 849.*]

(Syllabus by the Judge.)

Actions by Coxe Bros. & Co., Incorporated, by the Berwind-White Coal Mining Company and by the M. P. Smith & Sons Company against the Cunard Steamship Company, Limited, and the City of New York. Decree against the Cunard Company, and petition against the City of New York dismissed.

Robinson, Biddle & Benedict, for Coxe Bros. & Co.
Wilcox & Green, for Berwind-White Co.
MacFarland, Taylor & Costello, for M. P. Smith & Sons Co.
Lord, Day & Lord, for Cunard Co.
Francis K. Pendleton (George P. Nicholson, of counsel), for City of New York.

ADAMS, District Judge. This action was brought by Coxe Brothers & Company, Incorporated, to recover the damages, said to have been $600, sustained by reason of the Cunard Steamship Company's steamer Mauretania breaking adrift from her moorings on the north sied of pier 54 North River, on the 23d day of December, 1907, and colliding with their barges, the Roan and Tomhicken. The action of

the Berwind-White Coal Mining Company was for damages, said to have been $706.70, to their boats Eureka 32 and Eureka 36, on the same occasion. The action of the M. P. Smith & Sons Company was for damages, said to have been $2,250, to their barge Ellis P. Rogers, and for the loss of the personal effects of the master, $24, on the same occasion. All of these boats went to the place for the purpose of delivering coal to or receiving ashes from the steamers of the Cunard Line and no charge of fault has been made against them.

The libellants allege that the Cunard Company was in fault: (1) in having the Mauretania lie at said pier, (2) in not having her properly moored, (3) in not having her hawsers and cables properly fastened, (4) in having the steamship, in view of the weather conditions then existing, breasted off from said pier to allow a coal barge to lie between it and the pier, (5) in not reasonably inspecting the steamship's moorings, (6) in not paying proper attention to the weather conditions and further securing the steamship when it was seen that the wind was freshening, (7) in mooring the steamship to inadequate mooring posts, (8) in not giving proper inspection to the pier and mooring posts, (9) in using defective and insufficient mooring posts, and (10) in insufficiently fastening the mooring posts to the pier.

The allegations of fault on the part of the other libellants, though not as full, were practically the same.

The answer of the Cunard Company, after some admissions and denials, alleged:

"Ninth: On the morning of the 23d of December, 1907, the 'Mauretania' was lying moored at said pier 54 bow in and securely and in a proper manner moored to said pier, but by reason of a high wind, the strain on the mooring posts on said pier, was unusually great, and four of said mooring posts on said pier 54 North River, owned and maintained by the City of New York, to which posts the moorings of the bow of said steamship 'Mauretania' were fastened, gave way releasing the bow of said steamship. None of the moorings of said steamship, however, gave way, but remained intact. Said accident was wholly due to the condition of the posts erected and maintained by the City of New York, and was not due in any manner to any fault, negligence or carelessness on the part of the respondent, its agents or employees.

Tenth: Said pier No. 54 North River on said 23d day of December, 1907, was owned and operated by the City of New York and was not in any wise in possession of or subject to the control of this respondent. Said partial breaking adrift by the steamship 'Mauretania' was caused by the weakness of said mooring posts and by reason of the failure of the City of New York to furnish posts strong enough to bear the strain to which they were subjected on said day."

The Cunard Company then filed a petition to bring in the City of New York, alleging its ownership of the pier by the City and that it was not in the possession of or subject to the control of the steamship company, and that the breaking adrift of the steamship was caused by the weakness of the mooring posts and by reason of the City failing to furnish mooring posts strong enough to bear the strain they were subjected to.

The City, after some admissions and denials, alleged:

"That at all the times hereinafter mentioned, the City of New York was the owner of pier 54, North River, and that prior to and on the 23d day of December, 1907, the Cunard Steamship Company, Limited, occupied Pier 54,

North River, on a special permit from the Department of Docks and Ferries, a department of the City of New York having charge of said pier; that The City maintained on said pier a number of mooring posts of the regulation type, the same having been properly tested as to the tensile strength thereof before being placed in position and duly inspected thereafter by competent employees; that prior to the 23d day of December, 1907, the Cunard Steamship Company, Limited, obtained a permit to use the north side of Pier 54 for the purpose of docking their steamships, among which was the steamship 'Mauretania,' and before the said pier was occupied by the steamship 'Mauretania' and prior to the 23d day of December, 1907, the said Cunard Steamship Company, Limited, furnished to the Department of Docks and Ferries, the department of the City of New York having control of said pier, a mooring post and requested said department to place the same on said pier; that in accordance with said request of said steamship company, the said department did place on said pier the said mooring post, as requested, which had been delivered to the Department ·of Docks and Ferries by the said steamship company; that said mooring post was placed at a distance of about seven feet from the bulkhead on the north side of said Pier 54; that on the 23d day of December, 1907, the steamship 'Mauretania' was moored alongside of the north side of Pier 54, North River, with her bow towards the bulkhead. The day was dark and rainy, with a heavy wind blowing, and at about 10 A. M. on said day, the post near the bulkhead to which the bow mooring lines of said steamship were attached gave way, which subsequently put the strain on the other mooring posts, which in turn gave way, causing the bow of the said steamship to swing around and across the slip and caused her to strike a number of barges moored therein.

Tenth: Claimant, further answering the libel herein, alleges that a proper test was made of all the mooring posts furnished on said pier by The City of New York as to their tensile strength and they were properly inspected at all times prior to the time of the accident, and if any defects were contained in said mooring posts, they were unknown to The City or could not be discovered, and the condition of said mooring posts owing to the heavy wind was not caused through any negligence or want of care on the part of The City of New York, but was of a nature which The City could not guard against and was consequently inevitable.

Eleventh: Claimant alleges that if there was any damage resulting from the breaking away of the steamship 'Mauretania,' as alleged in the libel herein, the same was not caused through any negligence or want of care on the part of The City of New York."

The testimony showed that the Cunard Company had been expecting that its new ships, the Lusitania and Mauretania, would be in use in the summer or fall of 1907, and in February wrote to the Commissioner of Docks and Ferries to secure accommodations for them. The following correspondence took place:

"New York, January 9, 1907.

Hon. J. A. Bensel,
    Commissioner Department of Docks & Ferries,
        Pier A North River, N. Y. City.
Dear Sir,

Owing to the delay in completion of plans and giving out contracts for building the sheds on new piers, in the Chelsea District, it seems quite impossible that the work can be completed in time to meet our requirements in anticipation of the arrival of our two new steamers Lusitania and Mauretania, which it is now expected will be due at this port about July 1st proximo.

In consideration of the fact that there is no pier on the whole river front (excepting those in the Chelsea District) with length enough for these ships to lie in safety and without extending for 100 feet or thereabouts into the river beyond the end of the piers, I beg to ask your consideration in favor of building a temporary structure on one of the piers for the protection of passengers and their baggage, pending full completion of the permanent structures.

I would suggest a two-story wooden shed the full width of the pier, say about 250 feet in length, built about the center of the pier, where passengers and baggage could be landed under cover—it could be put up in the simplest and most inexpensive way, the main features being strength and utility for the purposes required.

Yours truly, Vernon H. Brown."

"New York, February 27, 1907.

Hon. J. A. Bensel,
Commissioner, Department of Docks and Ferries,
Pier A North River, N. Y. City.

Dear Sir,

Owing to the unavoidable delay on the part of Dock Department in constructing sheds on the new piers leased to the Cunard Steamship Company in the Chelsea District, by reason of the impossibility of getting prompt delivery of material, we find it necessary to make some arrangement for the temporary berthing of the two new large steamers 'Lusitania' and 'Mauretania' which we expect will be in service during the coming summer.

Under the circumstances we ask permission to erect on New Pier No. 54 a one-story wooden frame shed about 450 feet long by 80 feet wide and about 16 feet in height, with offices at the street end, all as shown on the drawings and specifications herewith.

The shed to be constructed and removed by the Cunard Steamship Company at its own expense.

Cunard Company to pay rental of Five Hundred Dollars ($500) in full per month for use of said pier, commencing with and during its temporary occupancy for the steamers 'Lusitania' and 'Mauretania,' and pending completion of the shedding of new piers which have been assigned to this Company.

Respectfully yours, The Cunard Steamship Co., Ltd.
Per Vernon H. Brown."

"New York, April 2nd, 1907.

Vernon H. Brown,
General Agent, Cunard Steamship Co.,
21 State Street, New York City.

Sir:

Noting your communication of the 27th ulto., I would state that there is no unavoidable delay on the part of this Department in constructing sheds on the new piers leased to your Company in the Chelsea section. The main delay up to the present time is owing to the impossibility of securing an agreement on matters of small detail between the architects and the Companies occupying the Chelsea Section piers. Further, in accordance with my verbal agreement with you, I am willing to give you a permit to construct a shed 450 feet long by 80 feet wide and about 16 feet in height, in accordance with plans to be hereafter approved for which privilege the Cunard Company is to pay at the rate of $500. per month; the Company also to have the right to berth the steamers 'Lusitania' and 'Mauretania,' on one side of the pier.

Very respectfully, your obedient servant, (Sd) J. A. Bensel,
Commissioner."

This pier, and others in the vicinity, was owned by the City of New York and it had exclusive jurisdiction of the pier in question, subject to the use by the Cunard Company under agreement contained in the foregoing correspondence.

Upon constructing the pier, in the summer of 1906, the City placed mooring posts at intervals of about 60 feet. The outermost post was of special size and strength and did not give way. It was not subjected to the strain, however, which caused those on the shore end of the pier to yield, and whether it would have had strength to withstand such strain was not shown. Between the outermost and innermost

posts was stretched a line of mooring posts, each 26 inches in height and uniform in size and construction. They were made of cast iron and hollow. They were bolted securely to the pier. They were shorter than other posts which had been used by the City but it did not appear that they were of less strength for such reason as they withstood quite as well the horizontal pressure they were intended for and were subjected to. The mere question of height of the posts may therefore be eliminated from discussion.

The thickness of the posts was not shown but it appeared that they were the usual type of posts which had been successfully used for many years. These posts were tested and inspected in the usual way by the city officials who supervised the construction of the pier.

As pier 54 was constructed by the City, there was no mooring post near the bulkhead and the City's attention was called to that fact in August, 1907, in a letter, of which the following is a copy:

"New York, Aug. 13; 1907.

Hon. J. A. Bensel,
        Commissioner of Docks & Ferries,
                Pier 'A' North River, N. Y. City.
Dear Sir,

There is no heavy mooring post on Pier (new) No. 54 near the bulkhead and a post of this character is necessary for hauling the ship ahead or holding her in position after being berthed—this matter is most important and we have in our possession a spare mooring post such as are in use on Pier 51—this can very readily be placed on the new pier provided you can set it up for us.

Kindly advise if you can arrange this matter for us, and much oblige,
        Yours truly,                                     The Cunard Steamship Co., Ltd.,
                                                                        Per R. L. Walker."

A few days later the following was also sent to the City:

"New York, Aug. 24, 1907.

Hon. J. A. Bensel,
        Commissioner of Docks & Ferries,
                Pier 'A' North River, N. Y. City.
Dear Sir,

On the 13th inst. we wrote to you about the necessity for putting up a heavy mooring post near the bulkhead on (new) Pier 54. North River, for hauling the 'Lusitania' into place and holding her in position after being berthed.

As we have had no reply, perhaps our letter miscarried. Will you kindly advise if the Department will place the post—we have on hand a spare one such as are now in use on Pier 51.
        Yours truly,                                     The Cunard Steamship Co., Ltd.,
                                                                        Per R. L. Walker."

Then the following action was taken by the City:

"Aug. 20th, 1907.

Report on communication from the Cunard S. S. Co., dated Aug. 13, 1907, requesting that an extra heavy mooring post be located on pier (New) 54 N. R.

Noting the attached from the Cunard S. S. Co., which in brief, is a request that an extra mooring post be located at the inshore end of Pier (New) 54 N. R., and agreeing to furnish same provided the Department will do the necessary work in connection therewith, it is recommended that the above named be advised to furnish the mooring post and the work of fastening same can be done by the force of the Department.
                                        Chas. W. Staniford, Engineer-in-Chief."

Subsequently the City issued the following order:

"Subject or Premises, Pier New 54, North River.
Bureau Order No. 5553 New York, August 26th, 1907.

By order of the Commissioner you are hereby directed to perform the work of fastening mooring post on above pier, said mooring post to be furnished by the Cunard Steamship Company, in accordance with your report on the communication from the Cunard S. S. Company, under date of August 13th, 1907, and report cost for collection from the Cunard S. S. Co.

Please make your report in relation to the above on the back hereof, and return this order to my office on the earliest date possible.

(Sd) Charles J. Farley, Chief Clerk."

To Chief of Bureau No. 1.

Upon this order was endorsed the following:

"New York, 17th October, 1907.

To the Commissioner of Docks—Sir:

In relation to the within order, I have to report as follows:

(Copy) 9 Sept. 07—C. W. Staniford, Esq. Engineer-in-Chief—Sir: In obedience to the within order—have fastened a mooring post on pier No. 54, N. R. for the Cunard S. S. Co.

Work was begun Aug. 28th and finished Sept. 4th 1907.

(Signed) Joel J. Pemoff Asst. Engineer.

Below is the cost of the above work, as reported by Mr. Weir, Apportionment Clerk at Pier 'A', N. R. for collection from the Cunard S. S. Co.:

Labor and supervision.................................... $26.01
Materials ................................................ 5.88

Total .................................................. $31.89

(Sd) C. W. Staniford, Engineer-in-Chief."

This additional mooring post was placed at a point designated by the Cunard Company and a bill rendered to it by the City as above indicated.

The Cunard Company desired to build a shed on the pier for its accommodation and accordingly such a structure as it deemed suitable was erected. The shed was 450 feet long, 80 feet wide and 16 feet high. The pier was 825 feet long and 80 feet wide. The shed began about 70 feet from the river end of the pier and extended to within about 200 or 300 feet of the bulkhead.

When the Mauretania went to the pier, she was made fast, lying bow in, on the north side of the pier, by 5 lines aft and 6 forward. Of these lines 9 were 8 inch Manilla and 2 were 3¾ inch wire, of the latter 1 was forward and 1 aft. The after lines were fastened to the 1st, 2d and 4th mooring posts from the outer end, and the forward lines were secured to the 1st, 2d, and 5th mooring posts from the bulkhead. The mooring posts on the north side only were used. No change was made in her position until about 7 a. m. of the 23d instant, when she was breasted out about 40 feet from the pier to allow coal lighters to get between the steamer and the pier. This was accomplished by slackening off the lines but they were not otherwise changed. The boats Tomhicken and Roan were then lying alongside of the next pier on the north, about midway of its length. The Eureka 32 lay outside of 4 other boats at the bulkhead, waiting to deliver coal, and

the Eureka 36 lay alongside of the steamer on her port side about amidships, also waiting to deliver coal. The Rogers lay alongside of the steamer on her port side waiting to take ashes.

The tide was running flood and the water almost high.

The Mauretania was the largest steamship afloat. She was 790 feet long and was of about 45,000 tons dead weight. She was drawing 24 feet 11 inches forward and 34 feet aft. Amidships the highest deck was about 60 feet above the water. The height of the pier above the water was about 6 feet. The height of the shed above the pier being about 16 feet, the steamer was exposed above the top of the shed about 38 feet. Forward, the highest part of the bow of the steamer was about 46 feet above the water, or about 40 feet above the floor of the pier, the shed not extending to that part of the pier.

About 9:45 a. m. the steamer broke adrift at her forward moorings, her bow swinging over toward the pier above, injured the mentioned boats.

No lines on the steamer parted. Her moorings remained intact but 4 out of the 6 posts used broke, leaving only the outside 2 with lines. She was then hauled back by running lines to the piles of the pier and across the pier to the mooring posts on the south side.

The wind at the time of the accident was from the southeast and it had full effect upon the steamer from the fact that she had no protection whatever forward, and aft only that afforded by the shed 16 feet high.

There was a sharp conflict as to the velocity of the wind, some of the Cunard Company's and the City's witnesses estimating it at 60 miles per hour, when a sudden squall prevailed. The Government Weather Records, introduced by the libellants, showed a wind movement of 31 miles, with a maximum of 40 miles for 5 minutes, between 8 and 9 o'clock, and a wind movement of 24 miles, with a maximum of 30 miles for 5 minutes, between 9 and 10 o'clock.

The libellants contend that the steamer was not properly moored, inasmuch as she used only 6 of the mooring posts on the north side of the pier, when 9 were available on that side, and in failing to use the 3 or 4 posts on the street end of the south side of the pier and 2 which could have been used on the river end. Those on the north side which were not used, however, would have added little to the security of the vessel because it was impracticable to so arrange the lines that they would have had a horizontal bearing, which was necessary to make them useful. Anything in the nature of a vertical pull would have been practically of no utility. With respect to the posts on the south side of the pier, they could only be used, on the shore end, by practically stopping traffic on that side of the pier. While it might be proper to resort to them in an emergency, they could not be used regularly without practically destroying the usefulness of the side of the pier, for which the Cunard Company had no authority or permission. They were used in the emergency, but it was testified that even taking such precautions as were practicable, that is, building wooden horses to support the cables, many narrow escapes from serious accidents were made.

There can be no doubt that a very strong wind prevailed at the time and that the steamer was moored to resist only such ordinary winds as prevailed on the two previous occasions of her using the pier. The question is, whether she was moored strongly enough to resist such a wind as could reasonably be expected at the season of the year the accident happened.

The Government Weather Observer in New York, in addition to the testimony mentioned above, said that a velocity of more than 50 miles an hour—

"occurs usually once a month, sometimes two or three or four times a month. * * * Q. If a squall lasted for less than five minutes it would not be recorded by those instruments? A. Perhaps the record would not be here but it would be on the tracing. The record I give here is for five minutes. Q. A sudden puff of wind blowing for a few seconds or part of a minute would not be recorded by those self registering instruments, that is a fact is it not? A. No, it is not a fact. It would be recorded. Q. It would not be noted as part of your record? A. Not unless it was for five minutes. * * * Q. You have no record of sudden squalls outside of the point where you take your records? A. No record. Q. You would not have a record of a squall that took place about 14th Street, a local squall? A. Not unless it prevailed at 100 Broadway, of course not. * * * Q. Is there such a thing as a squall at 14th Street that does not prevail at 100 Broadway, in your experience as a weather man? A. Not at this time of year, not in the month of December. * * * Q. A sudden squall may be limited to the area on which it is prevailing, may it not? A. Not during the winter months. That is true in the summer but not through the winter months. * * * During the winter months they are all general; if there is a gale of wind in one section of the city a gale of wind is blowing all over the whole city."

It is said in the Cunard Company's brief:

"All of the witnesses who testified as to the weather commented on the feature of the sudden squall. It is a matter of general knowledge that a squall may be of destructive violence at one point, while the wind is much lighter two miles distant. Capt. Roberts testified (p. 134): 'I have seen the forward sails of a sailing vessel taken completely off without the wind affecting the after part of the vessel at all.' It is also a matter of common knowledge that a sudden squall may blow with great violence but may not continue for five minutes."

In view, however, of the government weather records and the testimony of the observer, I do not think that much credence should be given to testimony as to a sudden gale of wind as creating an inevitable accident. I doubt if there would have been any accident if the pier had been shedded and the steamer given proper protection. I attribute the breaking adrift of the steamer to that cause. The posts no doubt were too weak to resist such storms as might reasonably have been expected at the season of the year, when the exposure of the vessel is considered, and it seems more reasonable to attribute the accident to such cause than to regard it as something which should not have been anticipated.

The case has not been brought within the authoritative definitions of inevitable accident. In The Louisiana, 3 Wall. 164, 173, 174, 18 L. Ed. 85, in rejecting such a claim in a collision case, it was said:

"The collision being caused by the Louisiana drifting from her moorings, she must be liable for the damages consequent thereon, unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis

major, which human skill and precaution, and a proper display of nautical skill could not have prevented."

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"The fact that the steamer was ordered by the government officers to take in coal at the old wharf, which had a narrow front when compared with the great length of the vessel, could not relieve the officers of the boat from the duty of securing her in such a manner as to prevent her drifting when the change of the tide and winds changed the direction of the forces acting upon the vessel. And the fact that under these circumstances she did drift, is conclusive evidence that she was not sufficiently and properly secured."

And in The Mabey and Cooper, 14 Wall. 204, 215, 20 L. Ed. 881, it was said:

"Inevitable accident, as applied to a case of this description, must be understood to mean a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident, and where the proofs show that it occurred in spite of everything that nautical skill, care and precaution could do to keep the vessels from coming together."

There can be no doubt that either the Cunard Company or the City is liable for damages to these libellants and it remains to be determined where, as between them, the responsibility rests.

It is claimed by the City that the cause of the accident may properly be attributed to the Cunard Company because the first post that broke was supplied by that company and placed on the pier by its request, as shown above, and the breakage of the others necessarily followed.

It appears that all the posts gave way at practically the same time. Some of the witnesses say that there was but a single report of the breaking. It seems to be rather unimportant but if otherwise, I think it may properly be concluded that the giving way of the posts were practically simultaneous. The breaking of the post, however, was not the real cause of the trouble, which was due as I have before stated to the insufficient protection given to the steamer by the shed.

This shed was erected by the Cunard Company and was not of ample proportions to give the vessel needed protection. This conclusion, it seems to me, suffices to fix the responsibility upon the Cunard Company. The City did everything that could reasonably be expected to give that company a secure place for its steamers. The posts were inspected by the city officials and found sound. They were of the same class that had been in use for several years on the different city piers. After the accident no flaws were found in them. There is no contention that they were not securely put up, as the manner of breaking shows they were. They were sufficient in number. The Cunard Company asked and obtained permission to use the pier and erected on it a shed which was inadequate for the purposes of protection. The posts were doubtless insufficient in view of the exposure of the vessel but that did not result from any insufficiency of the posts but from the lack of proper protection by sheds or structures on the pier.

The Cunard Company's agents were apprehensive that the posts were too small as it proved they were, when the test of severe weather came. This should have been provided for by that company. It had knowledge that risk to other property, and perhaps lives, would be incurred

by the use of the pier in the condition it was, and should respond for the damages.

There will be a decree against the Cunard Company, with an order of reference. Its petition against the City will be dismissed.