POSTAL TELEGRAPH-CABLE CO. v. HOME DREDGING CO.

HOME TELEPHONE CO. v. HOME DREDGING CO. et al.

(District Court, S. D. Alabama. June 19, 1915.)

Nos. 1458, 1515.

NAVIGABLE WATERS ☞8—DREDGING IN HARBOR—INJURY TO SUBMARINE CABLES.

A dredge at work in the turning basin at Mobile *held* not liable for fouling or injuring telegraph and telephone cables, which some two years before had been laid across on the bottom of the river, 300 or 400 feet above where the dredge was at work, and which, so far as shown, had not been moved.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 21.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suits by the Postal Telegraph-Cable Company against the Home Dredging Company and by the Home Telephone Company against the Home Dredging Company and dredge No. 4; Home Dredging Company, claimant. Decrees for respondents.

Decree in No. 1515 affirmed, 241 Fed. 252, —— C. C. A. ——.

Leigh & Chamberlain and Clarke, Brown & Howard, all of Mobile, Ala., for Postal Telegraph-Cable Co.

Hanaw & Pillans, of Mobile, Ala., for Home Telephone Co.

Stevens, McCorvey & McLeod, of Mobile, Ala., for Home Dredging Co.

TOULMIN, District Judge. In 1911, libelants' cables, involved in this case, are shown by the evidence to have been laid in Mobile river, and placed at least 300 or 400 feet north of the north line of the turning basin, mentioned in the evidence; the western portion of the cables being placed about opposite to the wreck of an old boat which lies in that locality, and several hundred feet west of the west line of said turning basin, and well away from said basin. The bottom of the river is soft mud, and a cable is likely to sink deep into the mud soon after being laid. In October, 1913, about the middle of that month, the accident and injuries complained of in these suits occurred.

There were witnesses both on the part of the libelants and the defendant, who had knowledge of the fact that these cables were laid in October, 1911, and where and how they were laid, and substantially agree, as hereinabove stated, as to the same. None of the parties in interest, who testified, and no witness, knew when or how they were moved or displaced from where they were laid in 1911. Yet they were found in the turning basin in October, 1913, where, the preponderance of evidence is, they were in October, 1913, at the time the dredge was operating in the north end of the turning basin, and when and where its cutter fouled the cables.

Paul Madison, the captain of the dredge, testified that he started to work on the upper end of the turning basin, and in the turning basin. The first swing of the dredge picked the wire up. There was but one wire on the cutter. Stein told him where to go to work and where to put the dredge, and was there when the dredge was put in place.

Stein testified that he was superintendent of the Home Dredging Company, and had been for three or four years. He saw the cables relaid in 1911, north of the turning basin, in line with an old boiler and an old tugboat wreck, about abreast of which they crossed the river. He stated that the old boiler was north-northwest from the northwest corner of the turning basin, and 200 or 300 feet from the north end of the turning basin. There were two cables laid at the same place, with a few feet between them. He knew of no further moving of the cables, and heard of none. He placed the dredge in position to go to work. He stated that he placed her about 25 feet north of the line of the ranges, about 25 feet up on the north slope of the turning basin and the ranges. There he left the dredge to go to work on the next or succeeding morning. The captain of the dredge which fouled the cable did not see the laying of the cables in 1911, was not present, and Stein stat-

ed that he told the captain where the cables were laid; that he told him this on the day just before the dredge went up to the turning basin, and again mentioned it to him when he (witness) went up there an hour later to place the dredge in position to work, and told him the cables were in line with the old boiler, and also told him to anchor south of the two red flags on the eastern shore. There was not 14 feet of water on the west side of the turning basin. There was 14 feet in the river above.

Witness Johansen, the lever man, testified that he controlled the "digging." "The dredge, when she started, might have been about 40 feet behind the ranges, which was the line which marked the north line of the bottom of the turning basin, and had just started when she fouled the cable." The witness also stated that he was present, with dredge No. 2, when the cable was laid in 1911. It was put right across from the old boiler. He also stated that he helped cut the cable off the cutter. There was only one cable around the cutter. The cutter was on the bow of the dredge, which was headed down the river, and back behind the ranges (which means north—up the river) about 40 feet.

Witness Ollinger testified that the old boat hull near the west shore was about 500 feet above the north line of the turning basin.

Witness Targett testified that the old sunken tugboat on the west side of the river was 200 or 300 feet from the north line of the turning basin. He stated that he had only to do with laying out the work for dredging, and that he did so in October, 1913. The range stakes indicate the north line of the turning basin. The entire length of the slope at the north end was 50 feet.

Witness Freeman stated that he saw the cable laid in 1911, just above the old sunken tugboat, and about abreast of the old boiler, and said this was several hundred feet above the cut.

Witness Kennerley, a government inspector, testified that the dredge was at the north end of the turning basin, placed there for dredging work. There were marks posted by the United States engineers to indicate where to dredge—stakes with two red flags on them. The range stakes were to indicate the lines bounding the basin, as distinguished from the slopes of the basin. The purpose of the ranges was to establish the beginning of the work. The dredge at the time of beginning the work was just north of the line of the stakes in the judgment of the witness, about 30 or 35 feet; and where the dredge rested and started the cutter was about 30 feet above the line.

Until the fouling of the cable by the dredge cutter in 1913, no one knew or suspected that the cables had been moved or displaced from their location in 1911, several hundred feet north or northwest of the turning basin, so far as was disclosed by the evidence in these cases. No one could or did give any explanation as to how or why the cables were found in the turning basin, so far away from where they were known to have been laid on the bottom of the river two years before. There were some suggestions as to how it might have occurred; but these were only theories, without any known facts on which to base them.

The libelants charge that the Dredging Company, or its agents, knew where the cables had been laid in 1911, and that they were guilty of

negligence in fouling their cables, concluding therefrom that the dredge was operating in the locality where the cables were known by said company to have been laid two years previous, invoking the rule, "Res ipsa loquitur." But the dredge was 300 or 400 feet away on the slope in the turning basin where she, as shown by the evidence, was at the time of the accidents actually working. There was no evidence tending to show that the defendant was to blame for the cause of the accidents.

"Where the collision occurs exclusively from natural causes, and without any negligence or fault on the part of either party, the rule is that the loss must rest where it fell, as no one is responsible for an accident which was produced by causes over which human agency could exercise no control." The Mabey, 14 Wall. 204, 20 L. Ed. 881.

"Where neither party is in fault, or where the fault is inscrutable, neither can recover, and the loss must rest where it falls." Woods v. Barge Banner (D. C.) 225 Fed. 433, and authorities therein cited.

My opinion is that the proof fails to show any negligence on the part of respondents, and that they are not responsible for the injuries complained of.

The libels are dismissed; and it is so ordered.