THE ROCKAWAY, etc.

THE SURVIVOR, etc.

*(District Court, S. D. New York.* January 15, 1884

1. COLLISION—ANCHORED VESSEL—PRESUMPTION.
   Where a steamer in motion collides with a vessel properly anchored, the presumption of fault is upon the former.
2. SAME—RINGING BELL—SNOW.
   There being no positive rule nor settled usage for a vessel at anchor to ring a bell in thick snow, *held,* such vessel is not in fault for not ringing a bell during a thick squall of snow of a few minutes' duration only.
3. SAME—CASE STATED.
   Where the ferry-boat R., running from Hunter's Point to Seventh street, New York, her usual course being near where the bark S. was anchored off Nineteenth street, was overtaken after leaving Hunter's Point by a sudden squall of thick snow, and on passing Twenty-third street was embarrassed by one of the ferry-boats of the Twenty-third street line crossing her bows, compelling her to stop and back, and while so doing, and being headed well towards the New York shore, she drifted down with a strong tide and ran afoul of the S. at anchor, the position of the latter being previously well known to the R., *held,* that the ferry-boat was in fault for not keeping further away from the known situation of the S.; *held also,* that under the circumstances it was not probable that the ringing of a bell would have been of any service to the R. in avoiding the collision, and that the R. accordingly was alone answerable.

In Admiralty.

*Shipman, Barlow, Larocque & Choate,* for ferry company.

*Jas. K. Hill, Wing & Shoudy,* for the Survivor.

BROWN, J. These cross-libels were filed to recover damages arising out of a collision, which took place in the East river, off Eighteenth street, a little after 7 o'clock in the evening of Sunday, December 26, 1880, between the brigantine Survivor and the ferry-boat Rockaway. The brig was a new vessel of 193 tons register, belonging at Windsor, Nova Scotia. She arrived at New York, loaded with potatoes, on the afternoon previous, by way of Long Island sound and the East river, and, after being taken through Hell Gate by the pilot in charge, was

left by him on the usual anchorage ground, known as the Poor House flats off Nineteenth street, about 450 yards from the New York shore. The brig Louisa Coipel was anchored just above and a little nearer the shore. The place of anchorage was at first disputed, but.is fixed with approximate accuracy by the pilot who anchored the Louisa Coipel, who states that she was anchored when he got in range of the west ship-house, at the navy-yard, as it opened along the line of the New York shore. This fixes the position of the brigantine at about 450 yards from the New York shore.

On Sunday, the day of the collision, the wind was strong from the north-east, with occasional spits of snow. At about 5 P.M. both vessels threw out a second anchor, apprehending a stormy night, and paid out 20 additional fathoms of chain. This would have brought the brigantine between Eighteenth and Nineteenth streets. The Rockaway, with her companion-boat, the Long Beach, was running from the ferry at the foot of Seventh street, New York, to Hunter's Point. Off Tenth street there is a reef of rocks near the middle of the river. The usual course of the ferry-boats is to run between this reef and the New York shore until off Seventeenth street, and then make somewhat across the river for Hunter's Point. When the weather is thick the boats go near the docks as far as Seventeenth street and then steer by compass across for Hunter's Point, and return in the same manner. At Seventeenth street the New York shore makes a sudden and deep bend to the westward, forming a sort of bay with the flats above referred to. The harbor regulations forbid vessels to anchor within 300 yards of the shore. While the Survivor was thus at anchor, the tide being strong ebb, the Rockaway, on one of her trips down the river from Hunter's Point, ran afoul of the brigantine, causing damage to both vessels. The ferry-boat at the time was headed more or less for the New York shore; was under slow headway through the water, and drifting down with the strong. ebb-tide. As she did so, the jib-boom of the Survivor ran through the second window from the front of the forward cabin of the Rockaway, on her port-side, and that side of the ferry-boat was carried away as far back as the wheelhouse. The boats became entangled; the Rockaway swung round with her head up river and upon the east or starboard-side of the Survivor, and was fast afoul from half an hour to an hour, when she was finally extricated through the aid of the Long Beach, which was approaching and very near at the time of the collision.

The witnesses on behalf of the ferry-boat testify that when the Rockaway left her slip at Hunter's Point the lights at Thirtieth street could be seen, but that a few moments afterwards, when she got out into the river, a thick squall of snow set in, which hid the lights on both shores, as well as the lights of the vessels at anchor, so that no light could be seen except at a very short distance; and that this snow squall and this condition of the weather continued until the collision. The pilot testifies that as he approached the crossing of

the Twenty-third street ferry from New York to Greenpoint, he blew signal whistles for this ferry, and received in reply two whistles from the ferry-boat Martha, of that line, which he recognized, indicating that she would cross his bow; that he immediately reversed his engine; that the Martha passed his bow very near to him; that he could only see her white light when she was close to him; that after she had passed, and while he was still drifting and backing, he ran afoul of the Survivor in the manner before described, not being able to see her anchor light, which was set in her fore-stay, until close upon her. This testimony in regard to the state of the weather is substantiated by three other pilots, namely, the pilot of the Long Beach, and the pilots of the Martha and Greenpoint, of the Twenty-third street line. They all testify that on this trip lights could not be seen any considerable distance, so as to be of service in avoiding vessels, and that they sounded their fog-whistle, as customary in thick weather. The witnesses on behalf of the Survivor, including some who were disinterested, state in general terms that the weather was not thick; that there was no snow to obstruct lights; that the lights on both shores were visible, and the lights of vessels visible at a good distance off. Such a conflict of evidence in regard to the weather is extremely embarrassing. But, upon a careful consideration of the testimony, and notwithstanding the able argument of counsel on the part of the company, I am not satisfied that the ferry-boat has absolved herself from the sole responsibility for this collision.

1. The brig was at anchor in a proper place, where she had a right to be, and with her light properly set. The pilot of the ferry-boat knew her precise position, and was bound to keep out of her way. The burden of proof in such cases is upon the vessel under way to show by a clear preponderance of proof that the collision occurred without fault on her part, or through some fault of the other vessel. *The Batavier,* 2 Wm. Rob. 407; *The John Adams,* 1 Cliff. 404, 413; *The City of New York,* 8 Blatchf. 194.

2. Even if the weather were as thick as the witnesses on the part of the Rockaway state, the latter must, nevertheless, be held in fault, because her pilot well knew where the Survivor lay at anchor, and was bound to give her a good offing, there being nothing in the way of his doing so. Moreover, a statute of this state requires steam-boats navigating the East river to keep in the middle of it; and this statute was held by NELSON, J., in the case of *The E. C. Scranton,* 3 Blatchf. 50, to be binding upon the Williamsburgh ferry-boats. The Rockaway in deviating from this rule did so at her own peril. The course of the Rockaway on this trip, by compass, as stated by the pilot, shows that no effort was made to keep in the middle of the river or to go much to the eastward of the Survivor. As respects her duty to keep away, the case is very similar to the case of *The D. S. Gregory,* 6 Blatchf. 528, in which NELSON, J., says:

"It was the duty of the D. S. Gregory [in a thick fog] to take every reasonable precaution in her power to avoid the Talisman. In this, I think, she failed. She knew that the Talisman was anchored in her track the afternoon or evening before; and, as the Talisman did not change her position down to the time of the collision, and the ferry-boat was passing her every trip she was making, the ferry-boat is chargeable with notice of her position, and should have been so navigated as to avoid her."

That case presented more difficulties from the surrounding shipping than the present, and, nevertheless, the ferry-boat alone was held liable.

3. It is urged that the Survivor was in fault in not ringing a bell when the weather was so thick with snow that lights could not be seen. There was not then, and is not now, any express rule or regulation in force in this country requiring a vessel at anchor to ring a bell in snowy weather. The rule provides for cases of fog only. The new international rules of navigation provide for snow as in cases of fog; but these rules have not yet been adopted by congress. There was no proof of any usage or custom of the port for vessels at anchor to ring a bell in snowy weather. See *The Bay State*, 1 Abb. Adm. 235, 241, note.

Without considering what may be the obligations of a vessel in this respect when anchored in the region where ferry-boats are in the known habit of passing, I have come to the conclusion that under the peculiar circumstances of this case there is not such satisfactory evidence or preponderance of proof on the part of the ferry-boat in regard to the condition of the weather for such a length of time as would justify me in holding the Survivor chargeable with negligence in not ringing a bell. The case is not one of the omission of a reasonable precaution to avoid the danger of a particular collision after that danger has become visible. The fault charged is that the Survivor did not commence to ring a bell when the weather, as is alleged, became thick, as a general measure of precaution, to enable ferry-boats and any other vessels to keep away from her. But the time during which this thick snow could have existed was extremely short; certainly not more than five or six minutes. No bells were rung anywhere else, either upon other vessels, or upon the ferry slips, which are in the habit of using bells in thick weather to guide boats coming in. Some suspicion necessarily attaches also to the claim that so thick weather should come on so suddenly, continue until the collision, and disappear a minute or two afterwards; and the proof to sustain it ought to be clear and satisfactory. Although four pilots of ferry-boats do testify to this, there are numerous circumstances in connection with the other direct evidence, which, contrary to my first impressions, have led me to hesitate, and at length to conclude, after much review, that the weather was not so thick for any such appreciable time as could constitute negligence in the brig for not ringing a bell. There must be some reasonable period allowed for observation, directions, and the execution of orders for such signals. A vessel at anchor, and

in a proper place, is not, I think, to be charged with extreme vigilance or watchfulness against collision with other vessels, nor held to be always prepared for the instantaneous sounding of a bell. Less vigilance is required of a vessel at anchor. *The Lady Franklin,* 2 Low. 220. The general absence of such ringing of bells as would be looked for if the weather was very thick is entitled to considerable weight, I think, as evidence that whatever thickness of weather existed was for so brief a period as not to have given occasion for bells to be rung, in the exercise of ordinary prudence. In the several years that have elapsed since the collision it is not impossible, also, that the thickness of the weather may have become somewhat exaggerated in the recollection of the witnesses on the part of the ferry-boat; and some important differences in their testimony and other circumstances of proved mistake have on the whole satisfied me that, as the main fault was very clearly on the part of the ferry-boat, there is not sufficiently satisfactory evidence of negligence to make the Survivor also legally responsible for the collision. If, moreover, the weather was as thick as alleged, it is not evident, and scarcely appears probable, that, considering the heading, the backing, and the drifting of the Rockaway after the embarrassment caused her by the Martha's crossing her bows, she would have received aid from a bell if rung from the Survivor. Her pilot had not lost his bearings; he knew the position of the Survivor and Louisa Coipel, and must have known his own position very approximately from the Martha's course. He does not claim to have been misled by the absence of the bell, and I doubt that the bell, if rung, would have made any difference in the result. *McCready* v. *Goldsmith,* 18 How. 89, 92.

In the case of Slocomb a reference may be taken to compute the damages to the Survivor, if the parties do not agree, and the cross-libel must be dismissed, with costs.