## THE FULLERTON.

(Circuit Court of Appeals, Ninth Circuit. February 2, 1914.)

No. 2262.

1. ADMIRALTY (§ 118*)—REVIEW ON APPEAL—FAILURE OF TRIAL COURT TO FIND FACTS.

Where a court of admiralty omits to find facts which are material to the issues in a case, although they are proved by the evidence, the case is reviewable by an appellate court on the facts unaffected by any finding of the trial court.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 758–775, 794; Dec. Dig. § 118.*

Appealable orders and decrees in admiralty, see note to In re Oceanic Steam Navigation Co., 124 C. C. A. 348.] .

2. COLLISION (§ 22*)—ACTION FOR COLLISION—DEFENSES—INEVITABLE ACCIDENT.

A vessel cannot be exonerated from fault for a collision on the ground of inevitable accident, where the other vessel was clearly not in fault, unless it is shown that those in charge of her navigation endeavored by every means in their power, with due care and caution and a proper display of nautical skill, to prevent the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 19; Dec. Dig. § 22.*]

3. COLLISION (§ 71*)—MOVING AND ANCHORED VESSEL—EXCESSIVE SPEED IN FOG.

The car ferryboat Transit, which ran daily but at irregular intervals between Oakland Mole and Mission Bay slip in San Francisco harbor, at night and in a dense fog, came into collision with the barkentine Fullerton in the anchorage grounds in Mission Bay, where she had been lying for about three months, several hundred feet out of the fairway of the Transit, as was known to the master of the latter. The Fullerton was properly lighted and was sounding her fog bell. The master of the Transit did not know where he was, and those on board did not see the lights of the Fullerton or hear her bell until too late to stop. The master testified that she was going at a speed of 7 miles an hour "more or less," and when moving at such speed she could not be stopped within less than 800 feet. *Held*, that the collision could not be attributed to inevitable accident, but was due to the fault of the Transit in moving at a speed which was excessive and negligent under the circumstances.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. Collision (§ 100*)—Vessel Navigating San Francisco Harbor—Excessive Speed in Fog.

A speed of 7 miles an hour in the harbor of San Francisco at night and in a dense fog is excessive.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 213–215; Dec. Dig. § 100.*

Collision rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

Appeal and Cross-Appeal from the District Court of the United States for the First Division of the Northern District of California; Frank S. Dietrich, Judge.

Suit in admiralty for collision by the Southern Pacific Company, as owner of the car ferryboat Transit, against the barkentine Fullerton (the Mission Transportation & Refining Company, claimant), and cross-libel. Decree dismissing both libel and cross-libel, and both parties appeal. Reversed and remanded.

In September, 1909, the Fullerton, a four-masted barkentine 235 feet in length belonging to the appellant herein, was anchored off Mission Bay slip in San Francisco harbor, and she remained so at anchor until December 13, 1909, when at about 11:25 p. m. in a dense fog the Transit, a freight car ferryboat operated by the appellee, collided with her. The Transit at the time of the collision was on one of her trips from Oakland Mole for the Mission Bay slip loaded with freight cars. She had passed the Fullerton on three or four, and sometimes many more, trips per day while the latter was at anchor. On the evening of the collision the Transit had left the Oakland Mole at 5:43 p. m. and arrived at the Mission Bay slip at 6:27. She left the slip at 7:14 and arrived at the Oakland Mole at 7:52. She left the mole again at 8:01 and arrived at Mission Bay at 8:40. At 9:30 she returned to Oakland, arriving there at 10:24. She left again at 10:53, and it was on this return trip that she ran into the Fullerton. Shortly after she started on that trip a dense fog set in. She proceeded at a speed of seven knots an hour, "perhaps more, perhaps less," according to the testimony of her master. Twenty-two or twenty-three minutes after leaving Oakland a fog bell was heard directly ahead of the Transit, and it was taken to be the bell on the Mission Bay slip. Shortly thereafter a lookout on the Transit reported the Fullerton's light. The master, who was in the pilot house steering the Transit, looked up from the compass, and, seeing the Fullerton's light, gave the signal to go full speed ahead and put the helm hard aport, aiming to cross the Fullerton's bow. Looking again, he saw there was no chance of avoiding a collision and, hearing the first officer, who was looking out of the pilot house window, say, "Stop her, Captain!" he rang the stop bell, but was unable to avoid the collision.

A libel was filed by the appellee against the Fullerton, and a cross-libel was filed by the appellant against the appellee, and the evidence was mostly taken in open court. The trial court held that the collision was due to an inevitable accident; if not that, to an inscrutable fault. Both parties have appealed.

Edward J. McCutchen, Ira A. Campbell, and McCutchen, Olney & Willard, all of San Francisco, Cal., for appellant and cross-appellee.

Louis T. Hengstler and J. E. Foulds, both of San Francisco, Cal., for appellee and cross-appellant.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] The court below, upon conflicting evidence, the value of which de-

pended upon the credibility of witnesses who were heard in open court, found that at and prior to the time of the collision the Fullerton's bell was being rung in the manner required by the rules. That finding, upon well-settled principles, may be taken as conclusive, since there is no showing that it is against the decided weight of the evidence. It was conceded that the Fullerton's anchor lights were up and were burning brightly. But the court made no finding as to the speed of the Transit, the darkness of the night, the density of the fog, or the precautions taken on board the Transit to prevent the collision. The court disposed of these questions by saying:

"While there are some features of the testimony which if detached tend to show a want of care in the navigation of the Transit immediately prior to the collision, considering the entire record I am inclined to the view that such a conclusion is not warranted."

In so disposing of the allegations in the libel against the appellee, the court omitted to find facts which were material to the issues and which were proven by the evidence, and the case comes here for review upon the facts, so far as they concern the conduct of the officers in command of the Transit, unaffected by any finding of fact of the court below. The E. A. Packer, 140 U. S. 360, 11 Sup. Ct. 794, 35 L. Ed. 453; The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84.

It is not disputed that when the Fullerton was anchored in September she was placed within the permitted anchorage ground and at a point from 1,000 to 1,500 feet south of the north boundary line thereof. It is contended by the appellee that three or four days before the collision a gale from the southwest, which at its maximum was 33 miles and 13.2 miles at the average, had shifted her position to the northward, so that she then lay within the Transit's fairway. The appellee did not make such an allegation in its libel, but alleged that at the time of the collision the Fullerton was anchored at a point near the Transit's fairway. The contention that the Fullerton's position was shifted is not sustained by the evidence; for, although the witnesses for the appellant do not agree as to the precise point of her anchorage as measured from the shore line, they substantially agree in placing her at least 1,000 feet away from the north line of the permitted anchorage zone, and their evidence is corroborated by the testimony of the master of the Transit, who, while he testified that the Fullerton had shifted her position, stated that shortly thereafter and before the collision he took bearings on her new position from the Mission Bay slip and found that she lay east northeast from that point, "perhaps 1,000 yards off shore. I don't know how far." The line of the bearing so taken, if extended 1,000 yards, would place the Fullerton more than 1,000 feet south of the north line of the anchorage ground, and if extended a greater distance it would place her still farther away from that line. The Fullerton was 235 feet in length, and she was well equipped with heavy anchors, her port anchor weighing something over 5,000 pounds and her starboard anchor 4,500 pounds, and both anchors were out when gales were blowing. The Transit's fairway opposite the point where the Fullerton was anchored was 4,500 feet wide. At no time had com-

plaint been made either by the harbor commissioners or by the officers of the Transit that the Fullerton was not anchored in a proper place. Other vessels were anchored within a quarter of a mile of her. She being thus properly anchored with bright riding lights up and her fog bell ringing, no fault can be imputed to her as contributing to the collision.

[2] The court below held that the collision was the result of inevitable accident. In collision cases the accident is said to be inevitable when it is not possible to prevent it by the exercise of due care, caution, and nautical skill. The term is usually applied to collisions caused by a vis major or by the intervention of other vessels or floating ice, or a severe snowstorm or the disablement of the steering gear. In The Mabey and Cooper, 14 Wall. 204, 215 (20 L. Ed. 881) the court said:

"Inevitable accident, as applied to a case of this description, must be understood to mean a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident, and where the proofs show that it occurred in spite of everything that nautical skill, care, and precaution could do to keep the vessels from coming together."

[3] The Fullerton being without fault, the question arises whether the officers in charge of the Transit endeavored by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the collision. The fact of the collision cast upon the appellee the burden of proof of showing that the Transit was without fault, for the officers of the Transit were well aware of the position of the Fullerton, having passed her many times in the three months during which she had been at anchor. Once or twice they had passed within 100 feet of her. At other times their course had run as far as a mile north of her. In The Virginia Ehrman, 97 U. S. 309, 315 (24 L. Ed. 890) the court said:

"Vessels in motion are required to keep out of the way of a vessel at anchor, if the latter is without fault, unless it appears that the collision was the result of inevitable accident; the rule being that the vessel in motion must exonerate herself from blame, by showing that it was not in her power to prevent the collision by adopting any practicable precaution."

See, also, The Oregon, 158 U. S. 186, 15 Sup. Ct. 804, 39 L. Ed. 943. We think the Transit was at fault in not coming to a stop and ascertaining the position of the bell which was heard shortly before the collision, and that the bell which was heard was the Fullerton's fog bell, notwithstanding that all the Transit's witnesses testified that the bell which they heard was the bell established by the appellee on the Mission Bay slip to guide the Transit in locating the slip in foggy weather, and that they did not hear the Fullerton's bell before the collision. The master of the Transit testified that a bell was heard 22 or 23 minutes after he had left the Oakland Mole. The fastest trip of the Transit across the bay that night, which must have been at full speed, for it was before the fog set in, was made in 38 minutes, and the average trip that night was 43¾ minutes, so that the bell must have been heard while the Transit was at least 15 minutes distant from the Mission Bay

slip, and if, as the master testified, the Transit was going at a reduced speed, he must have heard the bell when the Transit was about half-way across or a mile and a half from the Mission Bay slip. He testified that he usually heard it when he was 6 or 7 minutes, which would be a half a mile, away from the slip. There was no testimony that it was ever heard any farther away. The bell on the slip was placed in a box which was closed in the rear, with a sounding board behind it, and a flare out in front pointing, not toward the Oakland Mole, but directly out from the slip, and the sound therefrom was projected on a direction at a considerable angle from the Transit's fairway.

It is true that the Transit's witnesses testify that they recognized the bell which they heard and that they knew it was the Mission slip bell. Accustomed as they were to the sound of the bell, which was placed there for their guidance, their testimony is entitled to considerable weight. They did not testify, however, that they recognized the bell from any peculiarity of tone, but from the manner in which the strokes were made; that the bell on the slip was mounted and swung as a locomotive bell, while a fog bell on a ship is struck with a quick, jerky motion. The watchman on the Fullerton testified that the Fullerton's bell was struck by means of a rope attached to the upper end of the clapper, and that he usually rang it by striking the clapper against one side of the bell only. We think that the belief which the Transit's witnesses had that it was the Mission slip bell which they heard was very probably induced by the fact that they were not listening for the Fullerton's bell and not expecting to hear it. They all agreed in testifying that they had no thought of the Fullerton, that they believed that the Transit was proceeding on a course so far to the north of the position of the Fullerton that they need not expect to hear her bell. It seems impossible that they could have heard the bell on the slip in view of its distance from them; and when they heard a bell directly ahead of the course which they were pursuing, if it was indeed the Mission slip bell, they should have known they were far away south from where they thought they were and that they were within the permitted anchorage zone and approaching the position where the Fullerton lay. None of them testified that he heard the bell on the slip after the collision, and the master testified that he did not hear it thereafter. He added that he lost the Mission slip bell after the collision, "We drifted away from it and lost the sound."

[4] But whether or not the Transit was at fault in the particular matter just considered, we think she clearly was at fault in proceeding at a speed of 7 knots, "more or less," at night in a dense fog in the harbor of San Francisco. In The Pennsylvania, 19 Wall. 126, 134 (22 L. Ed. 148), the Supreme Court quoted with approval what was said by the Privy Council in the case of The Europa (Jenkin's Rule of the Road at Sea, 52):

"This may be safely laid down as a rule on all occasions, fog or clear, light or dark, that no steamer has a right to navigate at such a rate that it is impossible for her to prevent damage, taking all precaution at the moment she sees danger to be possible, and, if she cannot do that without going less than five knots an hour, then she is bound to go at less than five knots an hour."

The court added:

"We do not think the evidence shows any necessity for such a rate of speed as the steamer maintained. It is true her master, while admitting she was going seven knots, states that he don't consider she could have been steered going slower—could not have been steered straight. And two other witnesses testify that, in their opinion, she could not have been navigated with safety and kept under command at a less' rate of speed than seven miles an hour. These, however, are but expressions of opinion based upon no facts. They are of little worth. And even if it were true that such a rate was necessary for safe steerage, it would not justify driving the steamer through so dense a fog along a route so much frequented, and when the probability of encountering other vessels was so great."

Similar views as to the speed of vessels in a fog have been. expressed by the Supreme Court in other cases. In The Martello, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637, a speed of 5½ to 6 miles an hour in going out of the harbor of New York was held excessive. In The Chattahooche, 173 U. S. 540, 19 Sup. Ct. 491, 43 L. Ed. 801, seven miles off Nantucket Shoals was held excessive; and in The Colorado, 91 U. S. 692, 23 L. Ed. 379, "five or six" miles on Lake Huron was condemned as excessive. In The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687, a steamship was held responsible for a collision on the high seas when proceeding in a fog at the rate of 7 knots per hour. In the opinion in that case Mr. Justice Blatchford said:

"She was bound, therefore, to observe unusual caution, and to maintain only such a rate of speed as would enable her to come to a standstill, by reversing her engines at full speed, before she should collide with a vessel which she should see through the fog."

Similar cases are: The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123; The Louisburg, 75 Fed. 424, 21 C. C. A. 424; The Kentucky (D. C.) 148 Fed. 500; Pennell v. United States (D. C.) 162 Fed. 64; The Tennessee (D. C.) 181. Fed. 287; The Catalonia (D. C.) 43 Fed. 396; The Bailey Gatzert (D. C.) 170 Fed. 101; The Manistee, 7 Biss. 35, Fed. Cas. No. 9,028; The Eleanora, 17 Blatchf. 88, Fed. Cas. No. 4,335.

The Transit was a vessel broad of beam, 325 feet long, and owing to the construction of her engines she could not, when proceeding at a speed of seven knots, be stopped in less than 800 or 900 feet. She did not answer her rudder very quickly. Her highest speed was 11 knots. The contention is made that at a speed of less than 7 knots she would have lost steerageway, but this is not sustained by the testimony. The master's testimony was as follows:

"Q. I am asking you about the lowest speed you can keep steerageway. A. I have never found out going on the reversed bell. Q. As a matter of fact, can't you maintain steerageway at three knots? A. No, sir. Q. Why not? A. On account of one rudder. Q. What does she need, more rudders? A. One rudder is sufficient. I have been running over 35 years at that average speed. Q. Don't you think she would maintain steerageway at four knots? A. No, sir; but, as I said before, I do not know the exact amount of knots. I know when she is going slow, and we do not keep a log as you do in deep water ships, we run there under slow or fast bell. Q. You cannot tell me in knots how slow that vessel can go and still maintain steerageway? A. No, sir."

The argument is made that the speed of the Transit did not contribute to the accident, that the collision would have occurred even if she had proceeded at a speed of three or four knots per hour, for the reason that the fog was so thick that the men on the Transit could not discover the Fullerton's lights until it was too late to avoid a collision. The same argument might be made if the Transit had been going at her highest speed. The argument is not convincing. It is true that the witnesses on the Transit testified that they did not see the lights on the Fullerton until the Transit was within 200 feet of her, but the night watchman on the Fullerton testified that he saw the Transit's lights when that vessel was about three ship lengths away. He said:

"I heard the Transit approaching, what I believed to be the Transit from her whistle. I kept trying to look out for her, and kept striking the bell in between the whistles when I had a chance so as to give somebody on her a show to hear it. It was not very long after I heard her whistle that I saw the loom of her lights through the fog, and when she was about three ship lengths away I could see both of her range lights, one immediately after the other."

If the Transit had been proceeding at three or four knots an hour, the men on board of her would have had more time in which to hear the Fullerton's bell, the sound of which was, no doubt, obscured by the noise of the Transit's paddle wheels, machinery, and fog whistle, and the collision would probably not have occurred. Where the noise created by the passage of a vessel through the water by the working of her machinery, or otherwise, is sufficient to prevent the sound signals of another vessel from being heard, it becomes her duty to stop occasionally and listen, or to slow down to such degree of speed that the noise of her own passage through the water will not interfere with her ability to hear the approach of others. Spencer on Marine Collisions, § 48. In The Oregon (D. C.) 27 Fed. 751, it was said:

"If, instead of driving through a fog as dense as then prevailed, the steamer had stopped, even for a few moments, the noise of the machinery having ceased, the fog horn of the Mott would probably have been heard."

In The Eleanora, Judge Blatchford said:

"If the steamer had been going at less speed, or had gone ahead a short distance and then stopped still and listened, and thus made her speed, or her passage from point to point through the intervening space, and not merely her running rate while in forward motion, that 'moderate speed' which the statute requires, it is quite apparent that, blowing her whistle continually, at proper intervals, the blast would have been heard by the schooner, and answered by the fog horn over the starboard side of the schooner, in sufficient season for the steamer to have stopped and backed, and be brought to a standstill, before reaching the schooner. Therefore the steamer was at fault as to her speed."

The appellee cites the case of Wright & Cobb Lighterage Co. v. New England N. Co. (D. C.) 189 Fed. 809, in which Judge Holt remarked:

"Ferryboats cannot tie up in a fog. Public interests require that they should make their regular trips even in very thick fogs."

In that case it was held that a ferryboat was not negligent for navigating in the early morning in a fog so dense that other vessels could be seen but for very short distances, and was not in fault for colliding with a car float alongside a dock, which had been moored with two others off the end of the pier, and against which the ferryboat was drifted by the tide while waiting a clear entrance to her slip. The considerations that controlled the decision were that the captain, a licensed pilot of long experience, was at the wheel, that he had a lookout with him in the wheelhouse and another on deck forward of the gates, that he proceeded slowly, sounding fog signals, and was obliged to stop while another ferryboat landed, that he knew substantially where he was, that he could hear the big bell rung in fogs off the ferry entrance, that the trip in question was the first trip of his boat since about midnight, that he did not know that in the meantime the car floats had been moored off Pier 5, and that the court was of the opinion that no bell had been rung on the tugs which had the barges in charge.

The facts in that case distinguish it from the case at bar. The Transit was not a passenger ferryboat with a regular time schedule, but a freight car ferryboat running irregularly. The master knew where the Fullerton lay at anchor. He was out of his fairway and did not know where he was. He was proceeding at a speed which by the decided weight of authority was excessive. His vessel did not respond quickly to the rudder, and his engines were of such construction that at the speed of 7 knots she could not be stopped in less than 800 feet and could not at any speed be immediately reversed from ahead to full speed astern. Cases in point are The D. S. Gregory, 6 Blatchf. 528, Fed. Cas. No. 4,102; The Bedford, 5 Blatchf. 200, Fed. Cas. No. 1,216; The Rockaway (D. C.) 19 Fed. 449; Id. (C. C.) 25 Fed. 775. It follows that the appellee is answerable for the damage to the Fullerton by reason of the collision.

The decree is reversed, and the cause is remanded to the District Court for further proceedings.