## THE DJERISSA.

## THE NEWA.

### (District Court, E. D. Virginia.   June 19, 1919.)

1. **COLLISION ☞123—LIABILITY—FAULT—BURDEN OF PROOF.**

   In a libel for damages sustained in a collision between vessels which were anchored, one of which, in a violent storm, dragged into the other, the former vessel, claiming the accident was inevitable, must establish freedom from fault on her part.

2. **COLLISION ☞106—FAULT—VESSELS IN STORM.**

   In a libel for damages sustained in a collision between vessels anchored, the vessel dragging anchor in a storm cannot escape responsibility by insisting that the other vessel should have pursued a different course looking to her own protection from the storm, where such vessel's anchors did not drag.

3. **COLLISION ☞22—FAULT OF NEITHER PARTY.**

   Where a collision between steamships occurs, exclusive of natural causes and without the fault of either party, the loss must rest where it falls; but such a case requires that both parties must have endeavored by every means in their power, with due care and caution and a proper display of nautical skill, to prevent the collision.

4. **COLLISION ☞106—PRECAUTION—STORMY WEATHER.**

   In a libel to recover damages sustained in a collision, *held*, that libelee's navigators were not shown to have exercised such a degree of care as to relieve libelee from loss, but were negligent in not sooner dropping a port anchor and making earlier efforts to prevent the light vessel from dragging her anchors, in view of their notice of stormy weather.

In Admiralty.   Libel by one Paramor, master of the steamship Djerissa against the steamship Newa, to recover damages sustained in collision.   Decree for libelant.

Hughes, Vandeventer & Eggleston, of Norfolk, Va., for the Djerissa.

Allen D. Jones, of Newport News, Va., and Hughes, Little & Seawell, of Norfolk, Va., for the Newa.

WADDILL, District Judge.   About midday of the 11th of June, 1918, the Djerissa, a large ocean-going steamship, 350 feet long, 50 feet beam, 25 feet deep, was anchored in the waters of James river, Newport News harbor, about half a mile west of the Chesapeake & Ohio Railway passenger pier and the Newa, also a large ocean steamship, 305 feet long, 43 feet beam, 23 feet deep, was anchored about 2 o'clock on the evening of the 12th of June, about a quarter of a mile to the westward of the Djerissa.   While lying at anchor, about 9:30 on the night of the 12th of June, the Newa, in a sudden and violent storm, dragged into and collided with the Djerissa, causing serious injury to both vessels.

The Djerissa relies on the negligence and failure of the officers of the Newa to exercise good seamanship in anchoring and handling their vessel; whereas the Newa insists that she was without fault, and that the accident was inevitable as a result of the violence of the storm, the dangers of which they could not reasonably have anticipated or provided against.

Prior to and until a few minutes before the impact, the Djerissa had out her port anchor on 30 fathoms of chain, and the Newa her starboard anchor on 50 fathoms. Shortly before the storm, the Djerissa paid out 30 fathoms additional chain, and 15 or 20 minutes before the collision, and as the storm approached, dropped her starboard anchor on 45 fathoms of chain. The Newa, preceding the storm, had 50 fathoms on her starboard anchor, and paid out 35 fathoms additional, and about the time of the collision, but too late to be of service, dropped her port anchor on 45 fathoms.

The harbor was comparatively free from conditions and obstructions likely to affect this collision. The tide had been running flood for about an hour, but that is not material here. Evidence of an approaching storm was apparent as early as 6 p. m. and the weather, accompanied by thunder and lightning, was threatening for two hours prior to the collision, although the wind did not reach high velocity until immediately preceding it. The Weather Bureau record at Norfolk shows that from 8:59 to 9:09 the wind blew from the southwest 18 miles an hour; from 9:09 to 9:15, at 20; at 9:27 it dropped to 19; from 9:27 to 9:29 it increased to 44 miles; from 9:29 to 9:30, to 68 miles; at 9:37 it dropped to 60 miles; at 9:38, to 58 miles; at 9:39, to 48 miles; at 9:41, to 35 miles; and gradually declined until 9:59, when it had dropped to 15 miles. Doubtless the velocity out in the harbor of Newport News was something higher than shown by these figures; one witness describing it at its height, for short periods, at 75 miles an hour.

No question is made of the failure of the Newa to allow ample room to swing; nor is any denial made of the fact that she dragged into the Djerissa, and that the latter ship did not drag her anchor, nor do anything tending to bring about the collision, further than it is claimed she should have paid out anchor chain upon observing the Newa drifting into her, and thereby have lessened the violence of the impact; and the Newa relies solely upon this suggestion, and the fact that the collision could not have been avoided on her part by reason of the suddenness of the storm, as absolving her from responsibility for the accident.

[1] The case thus turns almost entirely upon whether the Newa, the burdened vessel, met the obligation imposed on her under the law, to entitle her to invoke the defense of inevitable accident. She must establish freedom from fault on her part to escape liability. The Severn (D. C.) 113 Fed. 579; The Juniata (D. C.) 124 Fed. 861; The Fullerton, 211 Fed. 833, 128 C. C. A. 359; The Bertha (D. C.) 244 Fed. 319; The Barge No. 123 (D. C.) 250 Fed. 476. The storm was an unusually violent one for a while, and it is true that several other vessels in the harbor dragged their anchors. But it by no means follows that, had the Newa's navigators exercised the nautical skill reasonably to be expected of them, having regard to the admonition of the impending weather conditions, by paying out more chain on her starboard anchor, or by earlier dropping her port anchor, they probably would have entirely avoided danger, such as was encountered.

[2] The Newa cannot escape responsibility for her action by insisting that the other vessel should have pursued a different course looking to her own protection from the storm in which the vessels were caught. The latter vessel put out her second anchor, and the two held the ship. While it may be true that if she had not done this, and had continued to swing on the single chain, she might have lessened the chances of the Newa dragging into her, still she might have been set adrift, and we would have two vessels running loose, instead of one. She selected the course that her navigators thought wisest for her safety, and she should not be held liable for not adopting a course conformable to the ideas of those navigating the other vessel.

[3] Where a collision occurs exclusive of natural causes, without fault of either party, the loss must rest where it falls. No one should be held responsible for an accident brought about from causes which could not be reasonably anticipated or provided against; but, where either party is at fault, this doctrine has no application. Inevitable accident, as applied to a case of this description, means a collision which has occurred, when both parties have endeavored by every means in their power, with due care and caution and a proper display of nautical skill, to prevent the happening of the same.

[4] Measuring the action of the respondent by this test, it cannot be said, under the facts of this case, that her navigators exercised the degree of care, prudence, and caution required of them, in order to sustain in their behalf the defense of inevitable accident. Having special regard to the weather indications, the impending storm, and the dangers of the particular anchorage arising from the likelihood of sudden storms and high winds reasonably to be expected at that season, and the fact that the Newa was light, her navigators should earlier have dropped the port anchor, and paid out more chain on the starboard anchor.

To sustain the Newa's defense would be in effect to hold that the harbor of Newport News was an unsafe one, by reason of dangers likely to arise from high winds and sudden storms. The court does not consider that the facts of this case, and those within its knowledge in the trial of many others before it, warrant this conclusion. On the contrary, by the exercise of reasonable nautical skill and judgment in anchoring ships, and maintaining such anchorage, no undue danger need be incurred. It would not seem to be at all unreasonable, in view of the large expanse of water there, and the fact that summer thunder storms, accompanied by high wind, occasionally happen, to expect ships to exercise special care when first casting anchor, and to see that provision is made to secure additional anchorage protection promptly, when needed. This is particularly true of light vessels, whose freeboards readily subject them to the force of the wind, and, of course, constant observation should at all times be kept of weather indications. Good seamanship and the plainest duty of self-protection would seem to indicate to the navigators of ships that they should omit nothing reasonably to be required of them that would tend to produce safety to themselves and others lawfully using the harbor.

It follows from what has been said, that the collision occurred solely as a result of the Newa's negligence, and a decree may be entered so ascertaining.