THE NORTHLAND. THE STIMSON. INGALLS v. BODDEN.

(Circuit Court of Appeals, Fourth Circuit. November 14, 1919.)

No. 1750.

1. COLLISION ☞56—BETWEEN SCHOONER AND OVERTAKING STEAMSHIP, FAULT OF STEAMSHIP.

A collision at sea on a clear night, between a schooner making 2½ or 3 knots and an overtaking steamship, *held* due solely to fault of steamship, on evidence that schooner kept her course and speed, and on seeing steamship 8 or 10 miles behind showed a bright white light astern, which should have been seen for at least 2 miles, but that she was not seen until within half a mile, and the steamship then kept her course and speed until collision.

2. COLLISION ☞56—DEFENSE OF INEVITABLE ACCIDENT NOT SUSTAINED.

Breaking of the steering gear of an overtaking steamship shortly before collision with a schooner *held* not to sustain the defense of inevitable accident, where it was through negligence that the steamship failed to see the schooner in time to safely avoid collision.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Judge.

Suit for collision by W. A. Bodden, master of the schooner Stimson, against the steamship Northland; L. C. Ingalls, master, claimant. Decree for libelant, and claimant appeals. Affirmed.

This is an appeal from a decree of the District Court of the United States for the Eastern District of Virginia, holding the steamship Northland solely in fault for a collision between that vessel and the schooner Stimson, which occurred about 13 miles southeast of Hog Island Light, off the coast of Virginia, at about 4 o'clock on the morning of October 14, 1918. The schooner was a four-masted schooner, of the gross tonnage of 693 tons, 185 feet long, 39.5 feet beam, 13.8 feet deep, and was bound from New York to Norfolk, light. The Northland was a steamer of the burden of 3,282 tons gross, 304.4 feet long, 47.2 feet beam, 19.8 feet deep, and engaged in the coastwise freight and passenger business on the route between New York and Norfolk.

It is conceded that the weather at the time of the collision was good, the wind being light from the southwest, the sea smooth, and the night being clear and starlight. The schooner, for some time prior to the collision, had been on a starboard tack, heading about south by east, making from 2½ to 3 knots an hour, with her four lower sails and four jibs set, and her regulation running lights properly placed and brightly burning. An experienced master was at the wheel, a sailor was on the forecastle deck of the schooner forward, keeping an efficient lookout, and two other sailors of experience were on the deck of the vessel; one of them having previously been at the wheel until he had been sent forward by the master to assist in tacking the ship. These men, together with the regular master and mate of the schooner, have testified in the case, and the others of the crew of nine of the schooner offered for cross-examination.

It appears that the Northland was proceeding on a course southwest, three-quarters south, making between 16 and 17 miles an hour, and was being navigated by her first officer in the pilot house, with a man at the wheel in the pilot house, and a lookout on the forward deck. It appears that the navigators of the schooner, some time before the collision, observed the white light of an approaching vessel several miles distant, off their port quarter, and when the steamer was about 2 miles away, and about eight minutes before the collision, her green light was observed still abaft on the port beam of the schooner, whereupon a white light was shown from the schooner's stern to the approaching steam vessel, this white light

being the regular anchor light of the vessel, a regulation light whose visibility is proved greater than 2 miles, and which was displayed off the port quarter of the schooner in such a position that the navigators of the steamer should have immediately observed it; that the schooner continued her course and speed unchanged, and the steamer overhauled her rapidly, seemingly regardless entirely of the presence of the schooner, and making no effort to avoid her; two or three minutes after the white light was shown, one of the crew of the schooner displayed an electric torchlight on the deck of the schooner forward of amidships in such position also to be entirely visible to the navigators of the approaching steamer; notwithstanding the lights thus displayed on the part of the schooner, the steamer Northland continued on with her course and speed apparently unchanged, coming into violent collision with the schooner a few minutes after this second light was displayed from her deck, striking her on her port bow about 30 feet aft of her stem, cutting several feet into her, and causing her most serious damage.

The lookout of the steamer did not testify; the man at the wheel gave his deposition, but stated that he did not see the schooner, nor did he know that there was a vessel in the vicinity, until he struck; the only witness testifying really as to the facts of the collision from the steamer being the first officer, who admits that he did not see any of the schooner's lights until she was about half a mile away, when he saw the white light when it was reported to him by the lookout, and immediately thereafter saw the red light, excusing himself from any fault for the collision by attributing it to a breakdown of the steering gear of the Northland.

The libel was filed in the lower court on October 14, 1918, and on October 28, 1918, the depositions of Capt. Marshal, acting master and navigating officer of the schooner, the lookout, wheelsman, engineer, and the mate were taken in Norfolk. It appears that the depositions of the first officer, the quartermaster, the second assistant engineer, the carpenter, and the master of the Northland were taken in New York on February 11, 1919.

It is insisted by appellee that these witnesses, at least the greater number of them, should have testified; but, on the other hand, it is insisted by counsel for the appellant that most of all the witnesses who did not testify had retired, and therefore could not have known as to the facts connected with the accident. However, none of them testified as to the facts of the collision, save the first officer and the quartermaster. These were the only witnesses examined on behalf of the Northland out of a crew of about 50 all told. Several other witnesses gave their evidence by deposition and before the court as to the construction of the steering gear of the Northland.

Henry H. Little, of Norfolk, Va. (Henry M. Hewitt, of New York City, and Walter H. Taylor, of Norfolk, Va., on the brief), for appellant.

Floyd Hughes, of Norfolk, Va. (Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). [1] The law in regard to this case is well established, but the facts are controverted, and in order to reach a correct conclusion it is necessary to ascertain, if possible, what actually occurred at the time of the collision. It appears that four witnesses testified on behalf of the schooner as to the material facts, while only one witness was produced who gave affirmative testimony on behalf of the Northland as to the main facts. It is true her quartermaster was a witness, but he only testified as to the accident to the steering gear. It appears that he had no report from the lookout, and saw no lights from the schooner.

He further testified that he did not see the schooner nor know of her close proximity until the collision.

MacDonald, first officer, the only witness who testified on behalf of the Northland as to the main facts, among other things, said:

"The obscuration of the atmosphere, whatever it might have been, in no way interfered with my observation of that light. I should say that the obscuration of the atmosphere would permit me to see the riding light of a vessel, or the colored lights of a vessel which I was approaching, for two miles that morning; there was just a light vapor on the water. I think I could have seen an anchor light about two miles, that is about all it is supposed to show. I don't think there was anything in the atmosphere that prevented me from seeing the lights of the Stimson when she was at least two miles off, if those lights had been properly displayed, either a white or a red light. As a matter of fact I did not see them until they were half a mile off."

This witness admits that he did not see the schooner until she was a half mile away. The fact that he did not see the schooner at a greater distance than a half mile shows that the steamer was at fault in this respect. It is true that he contradicts in many respects the witnesses for the schooner; but in weighing his evidence it should be borne in mind that he, above all other witnesses, was most interested, being in charge of the navigation of the steamship. But when we consider what he says in connection with the evidence for the schooner we are of the opinion that it should not prevail against the evidence of the latter; there being four witnesses introduced in the schooner's behalf. The evidence for the schooner is corroborated, in respect to the weather and physical facts about the collision, by Capt. Bodden and the mate of the schooner. The failure of MacDonald to observe the white light and the red light of the schooner until they were a half mile distant furnishes, we think, the principal reason why the accident occurred.

The learned judge who tried this case made a very clear and concise finding as to the relative position of the vessels at and just before the collision. He also states very clearly the contention of the respective parties, as follows:

"The schooner's case, briefly, is that while on the starboard tack, in the vicinity in question, and proceeding at about 2½ knots an hour, she observed the masthead light of the steamship some 8 to 10 miles away, bearing aft of her port beam, and subsequently, and when more than 2 miles away, she saw the steamship's green light; that at the time the schooner was provided with a skilled and competent crew, in charge of an experienced master, all at their proper stations, and efficiently performing their respective duties, with her running lights properly set and brightly burning; that upon observing the steamship's white light, and partly in the position of an overtaken vessel, she at once caused her regulation riding light for approaching vessels to be put out, placing the same in the most conspicuous position on the companionway of the after cabin, which was the best position in which it could be placed, and was in full view of the approaching steamship, and should have been seen 6 to 8 miles away; that in addition, as the steamship continued to approach, the schooner caused an electric light to be waved, and its light flashed upon her sails, to further attract the attention of the approaching steamship, and she kept her course and speed; that, notwithstanding the plain obligation imposed upon the Northland, the burdened vessel to avoid collision as well as the risk thereof, with the overtaken vessel, the schooner, she continued to approach her at a rapid rate of speed, claimed

to be 17 miles an hour, and ran into and collided with the Stimson, striking her about 30 feet aft of her stem on the port bow, seriously cutting into and crushing through the schooner from her rail down below to her water line, causing great damage, for the recovery of which this libel was filed.

"The schooner further charges that the steamship was without a lookout properly stationed; that she was in charge of incompetent and unskillful navigators; that she failed to keep out of the way of the schooner, or to shape her course so as to avoid crossing ahead of her and pass under her stern; that she failed to slacken her speed, stop, and reverse, and proceeded at a too rapid rate of speed; and that she, being the overtaking vessel, should not have collided with the schooner at all, but have avoided her by a wide margin.

"The respondent in the main, admits the circumstances of the two vessels approaching and coming together, as above stated, but contends: (1) That the collision was the result of inevitable accident, in that, when it was too late to avoid the consequences thereof, the connecting shaft of the steering gear broke and parted, through a latent defect, causing the injury. (2) That the Stimson was in command of an incompetent navigator, without a proper lookout, and that she omitted to exhibit her white or stern light in sufficient time to enable the navigators of the steamship to make proper maneuver to avoid the collision."

It is insisted by counsel for the appellee that in this suit, inasmuch as there was conflicting evidence, the decree of the lower court will not be reversed or disturbed, unless it is clearly shown that the court was in error. They cite in support thereof the following cases: The Richard F. Young, 246 Fed. 682, 158 C. C. A. 638; Baker-Whiteley Coal Co. v. Neptune Navigation Co., 120 Fed. 247, 56 C. C. A. 83; The Anaces, 106 Fed. 742, 45 C. C. A. 596. We think the rule as contended for by appellee is so well established that it is useless for us to enter into a further discussion of this phase of the question. The evidence is conflicting, but we think, when considered as a whole, the learned judge who heard the case in the court below was amply warranted in finding as he did.

[2] It is contended by counsel for the appellant that the collision was the result of an inevitable accident, in that when it was too late to avoid the consequences thereof the connecting shaft of the steering gear broke and parted through a latent defect causing the injury. This would be a good defense, if the facts of this case were such as to bring it within the rule. In the case of The Fullerton, 211 Fed. 833, 128 C. C. A. 359, the Circuit Court of Appeals for the Ninth Circuit, in discussing this question, said:

"The court below held that the collision was the result of inevitable accident. In collision cases the accident is said to be inevitable when it is not possible to prevent it by the exercise of due care, caution, and nautical skill. The term is usually applied to collisions caused by a vis major, or by the intervention of other vessels, or floating ice, or a severe snowstorm, or the disablement of the steering gear. In the Mabey and Cooper, 14 Wall. 204, 215 (20 L. Ed. 881), the court said: 'Inevitable accident, as applied to a case of this description, must be understood to mean a collision which occurs when both parties have endeavored, by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the occurrence of the accident, and where the proofs show that it occurred in spite of everything that nautical skill, care, and precaution could do to keep the vessels from coming together.' The Fullerton being without fault, the question arises whether the officers in charge of the Transit endeavored by every means in their power, with due care and caution, and a proper display of nautical skill, to prevent the collision."

The evidence as to when and how the steering gear was broken is far from satisfactory. The schooner was the favored vessel. Therefore it was the duty of the steamer to exercise such care as was necessary to avoid a collision with her. Not having by proper lookout observed the schooner when at least 2 miles away, the speed the steamer was making resulted in its coming in such close proximity to the schooner that it was well-nigh impossible to avoid hitting her, which places the steamer in the wrong. Therefore, if the steering gear really broke at the time as contended by appellant, it did not present a case of inevitable accident. There is evidence tending to show that they did not discover the break until after the accident, and in this connection it is significant that they displayed no signals to indicate this trouble for more than two hours after the collision.

It also appears that the steamer approached the sailing vessel at least twice after the collision, and made other maneuvers which would indicate that the steering gear was not disturbed in the way and at the time counsel for appellant contend. It is true they produced in court what purported to be the broken rod of the steering gear; but this only proves that the rod was broken, but throws no light upon the question as to the time it was broken, or of the circumstances under which the breakage occurred.

It further appears that the schooner was sailing on a starboard tack, with four lower sails and four jibs set, and was making only 2½ or 3 knots per hour, and that the wind was light from the southwest, and that the night was clear, with no haze or fog, and that her lights were properly set and burning. It also appears that the navigation of the schooner was in charge of an experienced master, and an efficient lookout properly stationed, who discharged their duties. There were two other men on deck, who had assisted in tacking the ship shortly before the lights of the steamer were observed. The schooner's speed was only about one-fifth of that of the approaching steamship, and we fail to see how the schooner could have committed any fault contributing to the collision. However, it appears from the record that she discharged her obligations as to course and speed. Indeed, there is no evidence that any fault in this respect was committed. MacDonald, among other things, said:

"I don't think there was any fault with the schooner from the time I saw the red light, or anything she could do to avoid the collision. I attribute the collision entirely to our failing to keep out of the way of the schooner by reason of our steering gear breaking down."

This sets at rest the question as to the conduct of the schooner. Taking it all in all, we think the evidence is such as to establish the fact that those in charge of the navigation of the steamer were negligent, and that such negligence was the cause of the collision, and for this reason we think that the defense of the steamer of unavoidable accident, even if their contention as to when and how the steering gear was broken be true, should not be entertained.

Therefore we are clearly of the opinion that the conclusions of the court below were correct. Such being the case, it necessarily follows that the decree of the District Court should be affirmed.

Affirmed.