## THE ADMIRAL WATSON.

(District Court, W. D. Washington, N. D.   May 21, 1920).

No 4511.

**1. Collision ⊙⟶102—Mutual faults of vessels meeting in narrow channel.**

A collision in a narrow channel between the steamer Admiral Watson and the power boat Helgeland, meeting, *held* due to faults of both vessels; the Watson for being on the wrong side of the channel, for failing to hear and answer the signal of the Helgeland when half a mile or more distant, or to keep an efficient lookout, and the Helgeland, although the privileged vessel, for failing to stop and give alarm signals, when the course of the Watson became uncertain and collision was imminent.

**2. Collision ⊙⟶11—Privileged vessel required to take precautions.**

The fact that a vessel is privileged and entitled to hold her course does not excuse her from adopting such precautions as may be required by statute and necessary to prevent a collision.

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for collision by Conrad Anderson and others, owners of the fishing boat Helgeland against the steamer Admiral Watson. Decree for libelants for half damages.

Winter S. Martin, of Seattle, Wash., for libelants, cited the following cases:

The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771; Britannia v. Cleugh, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660; The Isaac Newton, 59 U. S. (18 How.) 581, 15 L. Ed. 492; The Thielbek, 241 Fed. 209, 154 C. C. A. 129; The Putney Bridge (D. C.) 219 Fed. 1014; The Comport, 260 Fed. 151, —— C. C. A. ——; The Haida, 191 Fed. (D. C.) 623; Id., 196 Fed. 1005, 115 C. C. A. 376; The De Veaux Powell, 165 Fed. 634, 92 C. C. A. 54; Lie v. San Fran. & P. S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726; The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; The Suffolk, 258 Fed. 219, 169 C. C. A. 287; Carroll v. City of New York, 249 Fed. 453, 161 C. C. A. 411; The Hokendaqua, 251 Fed. 562, 163 C. C. A. 556; The Nereus (D. C.) 23 Fed. 448; The Admiral (D. C.) 39 Fed. 574; Atlas Transp. Co. v. Lee Line Strs., 235 Fed. 492, 149 C. C. A. 38; Spencer on Collisions, § 71, and cases cited on page 49; Stadacona, 242 Fed. 624, 155 C. C. A. 314; The Victoria, 168 U. S. 410–422, 18 Sup. Ct. 149, 42 L. Ed. 519; The Chicago, 125 Fed. 712, 60 C. C. A. 480; The Lansdowne (D. C.) 105 Fed. 436; The Saratoga (D. C.) 180 Fed. 620; Commonwealth & Dominion Line v. Seaboard Transp. Co. (D. C.) 258 Fed. 707; Marsden on Collisions (7th Ed.) p. 456; Chamberlain v. Ward, 21 How. 548, 16 L. Ed. 211; The Powhatan (D. C.) 248 Fed. 786; Marmet Coal, etc., Co. v. Feiger-Austin Dredging Co., 259 Fed. 435, 170 C. C. A. 411; The Madison, 250 Fed. 850, 163 C. C. A. 164; Jones v. Boice, 1 Stark. 493.

Grosscup & Morrow, of Tacoma, Wash., and Jones, Ridell & Brackett, of Seattle, Wash., for claimant, cited the following cases:

The Albatross (D. C.) 184 Fed. 363; The Arthur M. Palmer (D. C.) 115 Fed. 417; The Edwin J. Berwind, 144 Fed. 664, 75 C. C. A. 466; The Robert Dollar, 160 Fed. 876, 88 C. C. A. 58; The Trader (D. C.) 129 Fed. 462; The Joseph M. Clark (D. C.) 119 Fed. 462; The Straits of Dover, 120 Fed. 900, 58 C. C. A. 86; The Taurus (D. C.) 156 Fed. 838; Beatty v. Hanna, 122 U. S. 97, 7 Sup. Ct. 1158, 30 L. Ed. 1095; The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126.

NETERER, District Judge. On the evening of October 20, 1918, the steamship Admiral Watson and the fishing boat Helgeland collided in Alaskan waters near Ketchikan. Each vessel disclaims fault. It is stipulated that responsibility for the collision shall be determined, and that the amount of the damage, if any, shall be later ascertained.

[1] The issue now is: Was either of the vessels solely at fault, or were the vessels mutually at fault? At the time named, the Watson approached Ketchikan by the passage south of Pennock Island. In making the turn to starboard, bound for the Oil Dock I, she was proceeding at full speed under port helm. The Helgeland, leaving the

Northland Dock, was making a course towards East Clump light, and observed the Watson clearing the westerly end of Pennock Island, A on the appended diagram.

A–B–B–D.　Course of Watson.
C.　Helgeland when one blast was given.
D.　Watson when blast by Helgeland was given.
E.　Point of collision.
F.　Helgeland beached after collision.
G.　Government dock.
I.　Oil dock.

The Watson was continuing her course towards Ketchikan, A, B, B, D. The Helgeland blew one blast of her whistle at C, and changed her course to the right of the red buoy. The Watson, at this time, was at D, taking a course towards the Government Dock, G. The Watson did not answer the blast of the Helgeland. Both vessels continued on their course and speed until a collision was imminent, when the Watson blew two whistles, which the Helgeland answered by two

whistles, the Watson slightly starboarding her helm, and the Helgeland porting her helm, and the Watson ran into the Helgeland. When the Helgeland blew one blast, the vessels were from one-half to two-thirds of a mile apart. If two-thirds of a mile, it would, at the speed each was going, take 2 minutes and 25 seconds to bring them together. If one-half mile, 1 minute and 49 seconds. Both vessels were near the shore, to the starboard side of the Helgeland and the port side of the Watson. The pilot of the Watson estimated the distance "300 or 400 feet, or less," and in answer to the question, "Did the Watson change her course after blowing her two whistles?" replied:

"Changed her course a little to port. I could not afford to do it too much, for fear of running the ship ashore."

He also said that the Helgeland had the right of way, and that she came under the starboard right-hand rule, and that there was plenty of sea room for him to pass the Helgeland on his port side. While the captain says that a lookout was maintained, no report was made by the lookout, nor is there testimony that the lookout was on duty. Other witnesses on the Watson saw the Helgeland approaching in ample time for the Watson to have gotten out of the way. The pilot of the Helgeland says he had the right of way, and expected the Watson to change, but that she came "straight on, on our port side, two or three points on our port bow," and said he was sure that the Waston would port her helm. When asked why, he said, "We were so close to shore," and, on further inquiry as to why he kept his course and speed, said:

"I never thought she would cross a man's bow so close to shore, when she was so close to shore herself."

And, when asked why he did not give a danger signal, said:

"I had no business to do it, because we had the right of way by law. We had the right of way by law, and that is why I thought she would swing any moment, because she did not have to swing very far to clear her stern—swing very little to starboard to clear her stern."

When asked if he did not know the rule requiring the danger signal when in doubt as to the other's intention, he said, "He didn't comply with the law, either."

The Watson contends that it did not hear the blast of the Helgeland, and that it did not discover the Helgeland until it was within 400 or 500 feet, and immediately sounded two blasts and got permission from the Helgeland to cross her bow; but the Helgeland, contrary to its consent, ported its helm, and the collision followed.

I am satisfied from the evidence that the Watson did not sound a blast until the collision was imminent, and that the pilot of the Helgeland, through the imminence of the peril and confusion, gave the two blasts, and without any intention of giving up the right of way, and, whatever the conduct of the Helgeland when the blasts were given, the collision would have followed notwithstanding.

Direct and positive proof that a whistle was sounded may not be swept aside and disregarded, because others failed to hear it. Per-

sons charged with duty cannot excuse consequences of inattention by saying they did not hear what they should have heard, or failed to see what they should have seen, if their attention had been centered on duty. There is no question but all of the lights of the Helgeland were lighted; the dynamo performing its normal functions, the electric masthead and sidelights were normal. The masthead light was, perhaps, confused by the officers of the Watson with the lights on shore from the town of Ketchikan, and blended with the lights on the Ketchikan shore; but the night was clear, and the lights were observed by others in ample time to afford a safe passing, and the failure to observe these lights by the officers in charge of the Watson must be attributable to the insufficiency of the ship's lookout. The Stimson (D. C.) 257 Fed. 762; Id., 262 Fed. 245, —— C. C. A. ——. The failure to see the lights earlier was a clear omission of duty.

The Helgeland is a gasoline power vessel, 87 feet in length, 18-foot beam, two masts, schooner rigged, and equipped with 125 horse power, 56 net tons, documented and licensed at Seattle. The Admiral Watson is 250 feet long, 38-foot beam, 2,009 gross tonnage, 1,237 net tonnage.

The waters in which these vessels collided is a narrow channel. The Klatawa (filed May 8, 1920) 266 Fed. 120. The international, inland, and pilot rules provide:

"That in narrow channels, every steam vessel shall, when it is safe and practicable, keep to the side of the fairway or midchannel which lies to the starboard side of such vessel."

"When safe and practicable" is intended to cover the reasonable necessities of practical navigation. Vessels entering a narrow channel should so maneuver on approaching the entrance as to leave ample room for the outcoming vessel to pass port to port, approaching the channel from the side she must keep after entering. The Klatawa, supra. The Watson was not in her fairway. She was far to her port side of the channel, and she was clearly in the wrong. The Helgeland was the privileged vessel. It was duty of the Watson to keep in her fairway.

Under all of the circumstances, was the Helgeland justified in continuing in her course and speed after failing to get a response to her blast, and observing the approach of the Watson, being in doubt as to what the Watson would do? Pilot rule No. 1, art. 18, provides:

"If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less then four, of the steam whistle, the danger signal."

[2] The fact that a vessel is privileged, and entitled to hold her course, does not excuse her from adopting such precautions as may be required by statute, and necessary to prevent a collision. In The New York, 175 U. S. 187, at page 205, 20 Sup. Ct. 67, at page 74 (44 L. Ed. 126), the Supreme Court said:

"But the fact that a steamer is entitled to hold her course does not excuse her from inattention to signals, from answering where an answer is required, or from adopting such precautions as may be necessary to prevent a collision,

In case there be a distinct indication that the obligated steamer is about to fail in her duty, as was said in the case of The Sunnyside, 91 U. S. 208, 222: 'Cases arising in navigation, where stubborn adherence to a general rule is a culpable fault, for the reason that every navigator ought to know that rules of navigation are ordained, not to promote collisions, but to save life and property by preventing such disasters.' See, also, The Delaware, 161 U. S. 459; The Maria Martin, 12 Wall. 31, 47."

The master of the Helgeland must have known if he continued in his course a collision was inevitable. He did not give a danger signal, or stop her engines, or reverse. The Supreme Court in The New York, supra, 175 U. S. 207, 20 Sup. Ct. 75, 44 L. Ed. 126, said:

"The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn; but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect."

From what has been said it is apparent that the Watson was grossly at fault. She was not in her fairway. She failed to answer the signal. She did not maintain a proper lookout. But her unlawful and negligent conduct did not justify the Helgeland to continue in a course the inevitable result of which was collision in violation of her statutory duty, when the course of the approaching vessel was uncertain or in doubt, and her first signal unanswered. The Wakena (D. C.) 262 Fed. 989. The primary purpose of rules of navigation, as said by the Supreme Court, is not to fix arbitrary rights of the road to vessels, but rather for the safety of life and property.

The facts in this case, in some respects, are similar to the facts in The Hokendaqua, 251 Fed. 562, 163 C. C. A. 556, and Commonwealth & Dominion Line v. Seaboard Transp. Co. (D. C.) 258 Fed. 707; and the conclusion herein is not controverted by The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771, or Lie v. S. F. & P. S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726, cited by libelant, cr by any authoritative case.

A decree may be entered for half damages against the Watson and costs.